### In re ROCKEFELLER CENTER PROPERTIES and RCP Associates, Debtors.

### Nos. 95–B–42089, 95–B–42088(PCB).

United States Bankruptcy Court, S.D. New York.

April 17, 2000.

Swidler Berlin Shereff Friedman, L.L.P., by Earl H. Nemser, Gary J. Mennitt, New York City, for Reorganized Debtors.

Covington & Burling, by C. William Phillips, Lynn B. Oberlander, New York City, for The National Broadcasting Company, Inc.

*MEMORANDUM DECISION GRANTING, IN PART, AND DENYING, IN PART, THE REORGANIZED DEBTORS' MOTION FOR PARTIAL SUMMARY JUDGMENT DISALLOWING PART OF THE CLAIM OF THE NATIONAL BROADCASTING COMPANY, INC.*

PRUDENCE CARTER BEATTY, Bankruptcy Judge.

The debtors are the former owners of the world famous Rockefeller Center building complex in New York City. In September 1995, the National Broadcasting Company filed a timely proof of claim for $16,067,300 in alleged overpayments of rent escalation charges dating back to 1987 under a consolidated lease for space in the complex.

The debtors filed an objection to the proof of claim, coupled with a motion for partial summary judgment relating to the years 1987 through 1993 on the grounds, *inter alia,* that the claim for lease years 1987 and 1988 were barred by the expiration of the statute of limitations and the claims for years 1989 through 1993 were barred by the doctrine of "account stated." The claimant has opposed the grant of the partial summary judgment on legal grounds. In addition, the claimant urges that consideration of the partial summary judgment motion is premature because it has not yet completed discovery of the debtor's books and records or deposed its former employees.

Based on the findings of fact and conclusions of law which follow, the court grants the motion for partial summary judgment, in part, and finds that the claim for lease years 1987 through 1992 and those 1993 charges relating to extra elevator costs through July 1993 should be disallowed. As for all other charges relating to lease year 1993, the debtors' motion is denied.

### FINDINGS OF FACT[1]

*The Parties*

1. On May 11, 1995 (the "Filing Date"), Rockefeller Center Properties ("RCP" or "Landlord") and RCP Associates ("RCP Associates", together, the "Reorganized

---

1. The court's findings of fact are based on the Amended Joint Statement of Undisputed facts submitted by the parties on January 16, 1998 ("Amended Joint Statement")(Case Doc. No.

Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (the "Code").

2. Prior to confirmation, RCP Associates was the owner or ground lessee of most of the buildings which make up the multi-building Rockefeller Center complex (the "Buildings").[2] Its affiliate, RCP, was primarily responsible for the management and operation of the Buildings.

3. On May 29, 1996, the Reorganized Debtors confirmed a joint plan of reorganization. The effective date of the joint plan was July 17, 1996. The confirmed plan provided for the Reorganized Debtors to transfer their ownership interests in the Buildings to a designee of the first mortgagee on the effective date. All leases were assumed by the designee and Tishman Speyer Properties ("Tishman") was hired as the new managing agent for the Buildings. The terms of the joint plan of reorganization provided for the payment in full of allowed pre-petition claims.

4. The National Broadcasting Company, Inc. ("NBC") was a tenant of the

Buildings since their opening in 1937. At the time the Chapter 11 cases were commenced and prior to NBC's subsequent purchase of its building, NBC was the largest tenant in the complex. Over the years, NBC entered into various leases with the owner of the Buildings. On December 1, 1988, NBC entered into a consolidated lease with RCP (the "NBC Lease") covering various space occupied by NBC at the Buildings.[3] The NBC Lease is an amended version of the prior lease governing NBC's tenancy in Rockefeller Center.

*The Proof of Claim*

5. The bar date for the filing of claims was September 13, 1995.

6. On the bar date NBC filed a proof of claim in the amount of $16, 067,300 (the "Proof of Claim"). *See* Exhibit 1 to the Carroll Affidavit.[4]

7. The cover page of the Proof of Claim is Official Form 10 with the various answers filled in. Answer No. 1 states the basis of the claim by checking the box

931) as required by Local Bankruptcy Rule 7056 and as supplemented by this court's requirement that the proposed findings of fact be presented in a single document containing both parties factual positions, with comments detailing any disagreement on a particular finding. *See In re CIS Corp.*, 188 B.R. 873 (S.D.N.Y.1995). Presentation in a single document facilitates this court's ability to discern the disputes between the parties and the reasons for those disputes. The single document requirement also eliminates petty disputes over language and reveals more clearly the disagreements of substance.

The court has incorporated only so much of the Amended Joint Statement as it finds relevant and necessary for resolution of the motion for partial summary judgment. Only a brief synopsis of the claimant's assertions regarding the errors in the calculation of the rent escalations has been included in the findings of fact because it is adequate to outline the claimant's contentions. In addition to

findings of fact based on the Amended Joint Statement, the court has also made findings based on the papers submitted by the parties, as well as on documents in the Chapter 11 file.

2. The actual ownership and ground lease arrangements for all of the Buildings in Rockefeller Center is complex and is not material to this matter. Indeed, a few of the Buildings considered part of the complex have long had other owners.

3. The leased space is located at 30 Rockefeller Plaza, 1230 Avenue of the Americas and the adjacent studio building.

4. The Affidavit of Stephen R. Carroll, Chief Financial Officer of Rockefeller Center Management Corporation, sworn to on November 13, 1996 (the "Carroll Affidavit") (Case Doc. No. 784) contains as exhibits many of the documents relied on by the court in these factual findings.

"other" and adding the words "See Attachment ¶ 1." Answer No. 2 refers to "Attachment ¶ 2." Answer No. 5 states the Total Amount Claimed as "not less than $16,067,300." Attached to the first page is an additional six page typed document headed "Attachment to Proof of Claim." It is essentially an amplification of the information found on the first page. The consideration for the Proof of Claim and the basis of the Reorganized Debtors' liability to NBC are "categories of rent refunds" as to which NBC believes it is entitled under the NBC Lease. NBC states:

"In accordance with the terms of the Consolidated Lease, additional rent was to be calculated based upon RCP's actual increased costs of operations and providing building services above such costs during an agreed base year (1978). NBC believes, based upon a review of materials related to RCP's costs during a sample period, the RCP's incurrence of costs and allocation of costs to NBC in the calculation of NBC's additional escalation rent has been overstated."

Paragraph 1(a) states that NBC is due in excess of $9,936,000 constituting rent overpayments by NBC under the NBC Lease from December 1, 1987 through the Filing Date, together with interest thereon in the amount of $3,776,338. NBC has attached to its Proof of Claim an exhibit that purports to show the rent overpayments made in each lease year, with interest, for a total amount of over $13 million. NBC does not provide the basis for this calculation. Paragraph 1(b) states that NBC is due $431,000 in rent overpayments from January 1, 1993 through the Filing Date, together with $47,429 in interest "arising from a change unilaterally made by RCP in accounting procedures for determining the amount of compensation payable by NBC to RCP for additional elevator use." [5]

8. The Reorganized Debtors filed an objection to the Proof of Claim on or about November 16, 1996 and joined a motion for partial summary judgment as to the portion of the Proof of Claim for lease years 1987 through 1993 with a motion requesting a stay of discovery pending determination of the motion for partial summary judgment. NBC has conceded that its claims for lease years 1987 and 1988 are barred by the statute of limitations and that the only lease years at issue herein are lease years 1989 through 1993.

9. At a hearing held on September 9, 1997, the court stayed further discovery of the Reorganized Debtors' books and records or personnel for the years 1989–1993 on the grounds that (a) the discovery would be costly and labor intensive and (b) the discovery for those years would become irrelevant if the motion for partial summary judgment were decided in favor of the Reorganized Debtors. *See* Transcript of September 9, 1997 Hearing (Case Doc. No. 905).

10. On January 30, 1998 the court heard oral argument on the motion for partial summary judgment. At that hearing the court advised the parties that it was also viewing the motion for partial summary judgment as a motion to dismiss the Proof of Claim for failure to plead monies paid by mistake with particularity as required by Federal Rule of Civil Procedure ("FRCP") 9(b), made applicable by Bankruptcy Rule ("BR") 7009. The mo-

---

**5.** The remainder of the categories outlined in the Proof of Claim are not at issue herein. They relate to NBC's claim for overcharges for chilled water service and rent credits for capital improvements, which claims have been settled between the parties (Proof of Claim ¶ ¶ e through h) and NBC's claimed contractual assumption of service for certain electrical systems and chilled water systems (Proof of Claim ¶ ¶ c and d).

tion was subsequently taken under advisement.

*Additional Rent Escalation Statements*

11. The NBC Lease provided for the payment of a stated annual rent, to be paid in monthly installments throughout the year. In addition, the NBC Lease provided for the payment of additional rent (the "Additional Rent").[6] The method for calculation and payment of the Additional Rent, using a base year of 1978, was set forth in the NBC Lease. During the lease year, the Additional Rent to be paid each month was one-twelfth of the final amount of the Additional Rent for the prior year, with the final amount of the current year's Additional Rent to be fixed after the end of the lease year. Shortly after the end of the lease year, the Reorganized Debtors calculated the actual amount of the Additional Rent due for the just-ended lease year and sent a year-end Escalation Statement to the tenant showing the actual amount of Additional Rent due and the adjustments that were due in favor of the landlord or tenant as appropriate. The NBC Lease contains a provision for the "prompt" payment of the estimated Additional Rent during the lease year and the final adjusting payment upon the tenant's receipt of an Escalation Statement as follows:

"[T]he [1/12] installment [of the Additional Rent] for each calendar month [is] to be due and payable *promptly* upon the receipt from the Landlord of a bill for the same; it being understood that if, as finally determined, the amount of additional rent payable by the Tenant to the Landlord * * * shall be greater than (resulting in an underpayment) or be less than (resulting in

an overpayment) the aggregate of all the installments so paid on account to the Landlord by the Tenant for such Computation Year, then, *promptly* after receipt of the Escalation Statement for such Computation Year and, in performance of its obligations under the [NBC Lease], the Tenant shall, in case of such an underpayment, pay to the Landlord an amount equal to such underpayment or the Landlord shall, in case of such an overpayment, pay to the tenant an amount equal to such overpayment." *See* Article 24 of NBC Lease.[7] (Emphasis added).

12. Article 24(g) of the NBC Lease provides that the Cost of Operation and Maintenance is to be calculated as follows:

" '*Cost of Operation and Maintenance*' shall mean the *actual* cost (including depreciation of all hand tools and other movable equipment which is, or should be, capitalized on the books of the Landlord and the cost of hand tools and other movable equipment which need not be so capitalized, as well as the cost of maintaining all such hand tools and movable equipment) *incurred by the Landlord with respect to the operation, maintenance and repair of the Center and the curbs and sidewalks adjoining the same, including, without limitation,* the cost incurred for air conditioning; mechanical ventilation; heating; cleaning; rubbish removal; window washing (interior and exterior, including inside partitions); *elevators;* escalators; porter and matron service; electric current; steam; protection and security service; repairs; maintenance; fire, extended coverage, boiler, sprinkler, apparatus, public liabil-

---

6. In fact, almost all of the 600 commercial tenants in Rockefeller Center had a provision for additional rent in their leases. *See* Carroll Affidavit at ¶ 6.

7. The complete text of the NBC Lease is included in the Appendices to the Amended Joint Statement (Case Doc. No. 927).

ity and property damage insurance; supplies; wages, salaries, disability benefits, pensions, hospitalization, retirement plans and group insurance respecting service and maintenance employees; uniforms and working clothes for such employees and the cleaning thereof; expenses imposed pursuant to any collective bargaining agreement with respect to such employees; payroll, social security, unemployment and other similar taxes with respect to such employees; sales, use and other similar taxes; water rates; and sewer rents; *provided, however, that the term 'Cost of Operation and Maintenance' shall not include * * * (2) * * * the cost of any item* which is, or should in accordance with sound accounting practice be, capitalized on the books of the Landlord, * * * (4) *the cost of any work or service performed in any instance for any tenant of space in the center (including the Tenant) at such tenant's cost and expense to the extent that such work or service is in excess of any work or service which the landlord is obligated to furnish hereunder to the Tenant at the Landlord's cost and expense,* (5) the cost of any work or service performed for any other tenant of space in the center at the Landlord's cost and expense to the extent that such work or service is in excess of any work or service which the Landlord is obligated to furnish hereunder to the Tenant at the Landlord's cost and expense or (6) any costs incurred with respect to any theater or garage locate in the Center or with respect to the installation, operation or maintenance of any facility for which a charge (other than rent) is made by the Landlord for the use thereof such as an observatory, broadcasting facility, luncheon club, athletic or recreational club located in the center * * *." (Emphasis added).

13. Under the NBC Lease "extra" services are excluded from the Additional Rent calculation and are not part of the calculation of the Cost of Operation and Maintenance. *See* NBC Lease Article 24(g), *supra*. Rather, "extra" services, such as overtime air conditioning and elevator service are billed separately to NBC for the cost of NBC's actual use of the service.

14. There is no dispute that NBC received the Escalation Statements at or shortly after the date on each Escalation Statement. The Escalation Statements for the years 1989 through 1993 were dated as follows:

| Lease Year | Date of Escalation Statement |
| --- | --- |
| 1989 | 3/31/90 |
| 1990 | 3/20/91 |
| 1991 | 2/19/92 |
| 1992 | 2/16/93 |
| 1993 | 2/15/94 |

15. The annual Escalation Statements were simple one page documents which showed the multipliers for real estate tax and operating expenses, the square footage of the space and the amounts of Additional Rent actually paid during the lease year as against the final amount due. No details or backup information was included with the Escalation Statements. *See* Carroll Affidavit at Exhibit 4.

16. As of the Filing Date, NBC had been in possession of the (i) 1993 Escalation Statements since about February 15, 1994, or for over 1 year; (ii) 1992 Escalation Statements since about February 16, 1993, or for over 2 years; (iii) 1991 Escalation Statements since about February 19, 1992, or for over 3 years; (iv) 1990 Escalation Statements since about March 29, 1991, or for over 4 years; and (v) 1989 Escalation Statements since about March 31, 1990, or for over 5 years. NBC had paid all of the estimated Additional Rent during the course of each lease year from

1989 through 1992 based on the final amount of the Additional Rent for the preceding calendar year. NBC withheld a portion of its 1993 Additional Rent in connection with a dispute over its proportionate share of costs after the sale of 75 Rockefeller Plaza (the "Time Warner Building") and certain expense categorizations, among other things. *See* Finding 24. NBC did not put forth in the Proof of Claim any allegations, nor has NBC supplied any affidavits in opposition to the motion for partial summary judgment that reflect that the paid portion of the Additional Rent was paid by mistake or inadvertence. NBC made no allegations of actual fraud in its Proof of Claim nor has it put forth any evidence of fraud in its response to the motion for partial summary judgment.

*Audit Rights*

17. The NBC Lease provided that NBC had a right following its receipt of any Escalation Statement to perform an audit within the next six month period. In addition, there was a provision that the Landlord was only required to preserve related documentation for that period as was the Landlord's customary practice. The NBC Lease states:

> "When requested by the Tenant within 6 months following the receipt by it of any Escalation Statement, the Landlord, in substantiation of its determination of the amounts set forth in said Escalation Statement, will furnish to the Tenant such additional information as reasonably may be required for such purpose, and as may be necessary for the verification of such information, will permit the pertinent records of the Landlord to be examined by an officer of the Tenant

or by such independent certified public accountant as the Tenant may designate; it being expressly understood that the landlord shall be under no duty to preserve any such records, or any data or material related thereto, beyond any such time as shall be its customary practice with respect thereto." *See* NBC Lease Article 24 at ¶ 92.

18. Kenneth Hirsch, Manager of Finance in NBC's Broadcast and Network Operations Department from March 1989 to July 1993, was one of the people responsible for receiving and reviewing the Escalation Statements received by NBC under the NBC Lease.[8]

19. Hirsch states that in 1991, in accordance with the NBC Lease, NBC's Broadcast and Network Operations Department requested an audit of the 1990 Additional Rent as set forth in the Escalation Statement. Larry Pollington, a member of NBC's internal accounting staff performed the review. NBC discovered that it had been underbilled by approximately $4,000 for certain elevator usage, but the Landlord waived its right to collect this sum. NBC found no other errors or overcharges. Hirsch Affidavit ¶ 9.

20. On August 22, 1991 Hirsch, on behalf of NBC, sent a letter addressed to Desmond Lawe, the Director of Billings and Collections for Rockefeller Center Group, Inc. in regard to certain elevator charges, which stated:

> "In reviewing the RCI elevator billings, I have discovered an error which has recurred each month since a Lotus 123 model started being used during March 1989. The total 'AS' bank elevator hours were hard coded into the model at

---

**8.** *See* Affidavit of Kenneth Hirsch sworn to on January 23, 1997, in opposition to the Reorganized Debtors Motion for Partial Summary Judgment (the "Hirsch Affidavit" attached as an exhibit to Case Doc. No. 828). Hirsch is presently the Director of Finance for MSNBC Desktop Video.

3181.33 hours instead of summing the actual usage for Monday through Sunday plus Holidays. NBC was therefore overbilled by 4157.52 hours as detailed on the attached pages (1989=1267.39 hrs; 1990=1847.42 hrs.; 1991=1042.71 hrs.).

The credit will have to be calculated by analyzing each months billing to determine how many hours were *Premium Time* at rates of $57/hr to $71/hr, or *Other Time* at rates of $11/hr to $23/hr. The credit could be $100,100 to $250,000. I will ask the NBC operations personnel to wait until a reconciliation is made before paying the May, June and July elevator bills." *See* Hirsch Affidavit, Exhibit E.

21. On August 27, 1991, Ginny Sebra of the Billing Operations Department of the Rockefeller Group, Inc. responded to Hirsch's letter, resolving the issue:

"In response to your letter dated August 22, 1991, please find an attached schedule analyzing the credit due NBC as a result of an over-billing for elevator service from March, 1989 thru July 1991. Please note that *all* of the excess hours billed are related to the 'AS Bank Other Time' Category." *See* Hirsch Affidavit, Exhibit E.

22. In February 1992, Hirsch states that he discovered that NBC had been overbilled by slightly more than $2,000 a month for the period July 1989 through February 1992 and notified the Landlord's comptroller's office of his findings. In a memorandum written by Hirsch on February 14, 1992, Hirsch states:

"Yesterday I completed reviewing the RCP rent billing for the 30 Rockefeller Plaza complex. Using the operating escalations as supplied by RCP management, I completed the attached spreadsheet and compared the results to the monthly billing.

It appears that there has been an overbilling of slightly more than $2,000/month since the new lease went into effect. This may have been a miscalculation by RCP of the credit to be given monthly to remove Real Estate Taxes from the base rent.

In addition, the Operating Base cost on space MER–1 was changed from $8.23 to $3.69, causing NBC to pay an additional $4.54/year for Operating Escalations on 701 sq/ft ($265/month). This started with the 1991 escalation adjustments. I have asked the controller's office at RCI to review my figures, and if they are correct, to issue a credit." *See* Hirsch Affidavit at Exhibit F.

A second memorandum written by Hirsch on April 15, 1992 states that the matter was resolved and that NBC would receive a credit of $69,451 covering the July 1989 through April 1992 overbillings. *Id.*

23. Robert W. Miller, Manager of Finance in NBC's Broadcast and Network Operations Department from November 1993 through July 1996, was also responsible for receiving and reviewing the Escalation Statements.[9]

24. Miller states that in early 1994 NBC received its Escalation Statement for 1993 which showed an adjustment of over $500,000 still owing. NBC requested an audit of the Escalation Statement. Larry Pollington, who had conducted the 1990 audit but was no longer employed full time

---

9. *See* Affidavit of Robert W. Miller, sworn to on January 23, 1997, in Opposition to Reorganized Debtors Motion for Partial Summary Judgment ("Miller Affidavit")(Attached to Case Doc. No. 828). Miller is presently the Manager, Technical Operations–Finance for MSNBC.

by NBC, was hired as a consultant to perform the 1993 audit. Following its review, Miller states that the audit uncovered (i) that RCP had reduced the rentable square footage for the Center by over 500,000 square feet due to the sale of the Time Warner Building which resulted in the proportionate share of NBC's costs to rise; and (ii) that RCP had included as expenses a number of items, such as radio and cleaning equipment, "that under proper accounting practice should have been capitalized." *See* Miller Affidavit ¶¶ 9–13. On the basis of these objections, NBC withheld a portion of its 1993 Additional Rent pending the outcome of the audit. Miller states that these issues were raised with the Landlord but were not resolved prior to the Filing Date.

25. After the lease year 1993 audit, NBC also raised an objection to extra elevator service and chilled water charges stating that the audit uncovered that in 1993 the Landlord had changed the accounting methodology used to calculate extra elevator service charges which resulted in an estimated increased cost to NBC of $894,000 from 1992 to 1993 and that NBC was being double billed for condenser and chilled water services for extra HVAC services sold to tenants. Exhibit G to the Hirsch Affidavit, however, contains two letters which deal directly with the resolution of the extra elevator charge dispute through July 1993. The first letter, dated December 21, 1992 from Hirsch to Desmond Lawe states:

"On Wednesday, December 23, 1992, NBC will wire transfer the amount of $250,000.00 to Rockefeller Center Properties, which represents a payment against account for extra elevator services for the period December 1, 1988 through December 31, 1992. We note that a dispute currently exists under the lease between NBC and you concerning extra elevator services and rates.

By making this payment, NBC does not intend in any way to waive the foregoing disagreement or any rights it may have in connection therewith."

The second letter resolving the dispute, dated September 21, 1993, is a letter agreement between Steven Carroll, then the Senior Vice President of Rockefeller Center Management Corporation and Brij Anand, an employee of NBC, which states:

"Attached herewith is a schedule detailing the settlement of elevator service charges for the period May 1991 through July 1993. As agreed to by NBC and RCP, a balance of $455,961 is to be paid by NBC to RCP *in final satisfaction* of the open charges.

We also hereby confirm the agreement reached by NBC and RCP whereby NBC will receive an additional 118 free hours of elevator service per week in the 'F' bank, as well as a 25% volume discount on the rate charged for additional elevator services effective with the August 1993 billing for elevator services. Annual increases in the basic rate charged for elevator services will be limited to the percentage increase in the consumer Price Index for All Urban Consumers (N.Y., Northern NJall items.)" (Emphasis added).

26. Any objections raised by NBC to any of the 1989–1992 Escalation Statements were met and resolved between the parties and there has been no evidence submitted by NBC that any objection raised prior to the filing of the Proof of Claim had not been resolved for those years. As for lease year 1993, following the 1994 audit of the 1993 Escalation Statement, NBC withheld payment of the year end reconciliation amount pending the outcome of the audit. The unresolved issues relating to the lease year 1993 Escalation Statement are the share of NBC's

costs based on the sale of the Time Warner Building and the categorization of the various previously identified 1993 lease year expenses.

27. Other than the objection to the change in accounting methodology for the extra elevator charges and chilled water charges, which are not part of the Additional Rent calculations, the Proof of Claim does not identify or specify the nature of any overcharges in the Additional Rent paid under the NBC Lease. In its opposition to the partial summary judgment motion, NBC offers a preliminary report prepared by the accounting firm of BDO Seidman, L.L.P *after* the Proof of Claim was filed (the "Preliminary BDO Seidman Report").[10] The Preliminary BDO Seidman Report concludes that NBC was overcharged at an annual rate of at least $2 per square foot for operating expense escalations during the pendency of the NBC Lease from 1989 through July 17, 1996, the effective date of the confirmed plan. Pappas Affidavit at ¶4. NBC asserts that these overcharges were the result of the Reorganized Debtors' miscalculation of the escalation amounts due under the NBC Lease. *Id.* at ¶7. NBC, in reliance on the Preliminary BDO Seidman Report, has categorized the areas as to which it believes it has been improperly overcharged in the Additional Rent calculations. Some of these categories include: [11]

a. *Misallocation of Corporate Overhead:*

The Preliminary BDO Seidman Report shows that in 1978 (the Base Year under the NBC Lease), only four categories of corporate overhead, aggregating approximately $295,000, were allocated to property operations and charged to tenants of Rockefeller Center as Additional Rent. By 1994, it shows that there were 28, out of 32 listed categories, of corporate overhead, aggregating approximately $1,700,000 which were charged to the Center's tenants. NBC asserts that these overcharges include, *inter alia,* (i) management salaries of $363,000 in 1990 and $34,000 in 1993; (ii) stationery expenses of $124,000 in 1990 and $243,000 in 1993; (iii) travel and entertainment expenses of $52,000 in 1990 and $25,000 in 1993; and (iv) office furniture and equipment of $11,000 in both 1990 and 1993.

b. *Improper Capital Costs:*

The Preliminary BDO Seidman Report shows that by 1995 there were 31 capital cost items, which NBC asserts demonstrates overcharges totaling $472,860 including, *inter alia,* (i) $81,187 for the fabri-

10. The Preliminary BDO Seidman Report is outlined in the Affidavit of Michael E. Pappas, Senior Managing Director of Corporate Real Estate Services for BDO Seidman, L.L.P., sworn to on January 23, 1997 (the "Pappas Affidavit", as attached to Case Doc. No. 828, as well as Exhibits 2, 3 and 4 attached thereto).

11. While not a final report, the Preliminary BDO Seidman Report attaches a list of the invoices reviewed by BDO Seidman which are not, in Pappas' opinion, expenses which are includable as a cost of operation and maintenance under the NBC Lease.

The court's categorization was compiled from the information contained in the Amended Joint Statement and the list of invoices contained in the Preliminary BDO Seidman Report. The court notes that except for the category of Misallocation of Corporate Overhead which includes NBC's calculations for the years 1990 and 1993, the other categories are based on 1994 and 1995 invoice information, years not at issue herein. Due to the limitations on discovery and for purposes of this decision the court accepts the 1994 and 1995 information as representative of the items which NBC believes were inappropriately included in the Additional Rent calculations for the earlier years which are at issue.

cation and installation of 55 new awning covers for the retail tenants; (ii) $76,999 in labor costs for various projects, including costs associated with the Rainbow Room restaurant, sidewalk replacement and the resetting of stone work on the north and south facade of the Buildings; (iii) $13,676 for an elevator alteration project; (iv) $5,005 for a new kitchen door; and (v) $376 for copies of all Rockefeller Center CAD library drawings.

### c. Costs relating to Radio City Music Hall and Garage

The Preliminary BDO Seidman Report sets forth 5 alleged overcharges in 1995 totaling $8,244 which include (i) $3,572 to relocate a duct for Rainbow and Stars; (ii) $2,662 for a garage area paint job; (iii) $1,800 for pump maintenance service fees at Radio City Music Hall; and (iv) $210 for a permit for garage air conditioning.

### d. Other Miscellaneous Costs

The Preliminary BDO Seidman Report sets forth 39 miscellaneous alleged over-

charges which include, *inter alia* (i) $18,943 for skating rink plantings; (ii) $10,002 for seminar fees (iii) $3,760 for executive country club memberships; (iv) $2,386 for flower arrangements; (v) $500 in funeral arrangements; (vi) $319 for Christmas party invitations; and (vii) $107 for tuxedo rentals. Other expenditures in this category also include the costs associated with the annual world famous Rockefeller Center Christmas Tree display [12] as well as costs allocated with the annual flower and garden shows.

### e. General Increase in Operating Expenses

Pappas states that the Reorganized Debtors' operating expenses were "almost double the industry average" during the 1989–1994 period. Pappas Affidavit ¶ 13. He further maintains that "[n]ot only are these amounts particularly disconcerting in and of themselves, but what is truly alarming is the amount and rate of increase from 1978–1989. Over this eleven year

---

12. This court notes that NBC's objection to being assessed a share of the costs associated with annual Christmas Tree display is not a novel one. In 1992 Rockefeller Center tenant Jerome Kretchmer and Company made the same argument before the Supreme Court of the State of New York. *Jerome Kretchmer and Company, Inc. v. Rockefeller Center Properties,* 1992 Lexis 682 (N.Y.Sup.Ct.1992). In *Kretchmer* the plaintiff argued that the cost of the annual Christmas Tree was improperly billed to tenants and that such costs were not within the scope of the landlord's "cost and operation" of Rockefeller Center as set forth in the plaintiff's lease. The court held "as a matter of law" that the lease language of "operation, maintenance, and repair" did include the cost of the annual Christmas Tree. *Id.* at *5. The *Kretchmer* court went on to state that "[t]he Rockefeller Center Christmas tree is a highly publicized, traditional event since 1932. It should come as no surprise * * * that paying for the tree is part of the 'operation' of Rockefeller Center as provided for in the lease * * *." *Id.*

Likewise in October 1999, this court held that The Chase Manhattan Bank was similarly liable for its proportionate share of the costs associated with the annual Christmas Tree display. *See In re Rockefeller Center Properties, et al.,* 241 B.R. 804, 815 n. 17 (Bankr. S.D.N.Y.1999).

This court notes the irony of NBC complaining about any charges assessed in connection with the Christmas Tree display since there is no tenant in the Rockefeller Center complex more associated with the Christmas Tree than NBC. Each holiday season NBC broadcasts the lighting of the Christmas Tree as a prime time television event. NBC also uses the Christmas Tree as the background for its bumpers on the NBC Nightly News. Finally, each Christmas season, viewers are inundated with the sights and sounds of NBC anchors and news staff, both national and local, singing carols and swaying in front of the Christmas Tree in celebration of the holiday season.

period, the rate of increase in the Center's operating expenses were more than double the rate of inflation." *Id.* Finally, in Pappas' opinion, these overcharges resulted from the inclusion of expenditures which are not allowable operating expenses pursuant to the terms of the NBC Lease and/or general real estate industry practice. Pappas Affidavit ¶ 7.

*Additional Lease Provisions*

28. The NBC Lease provides that "the failure of the Landlord or the Tenant to insist in any instance upon the strict keeping, observation or performance of any * * * provision or condition of this lease * * * shall not be construed as a waiver or relinquishment for the future of such * * * provision [or] condition, but the same shall remain in full force and effect." *See* NBC Lease at Article 21.

29. The NBC Lease provides that "[no] waiver or modification by the Landlord or the Tenant of any covenant, agreement, term, provision or condition of this Lease shall be deemed to have been made unless expressed in writing and signed by the landlord or the tenant, as the case may be." *Id.*

30. The NBC Lease provides that any non-payment of rent by NBC, including the Additional Rent, constitutes a default under the NBC Lease and permits the Landlord to issue a Notice of Default. If the default continues for ten (10) days after NBC's receipt of the Notice of Default, the Landlord can terminate the NBC Lease. *See* NBC Lease at Article 15.

---

**13.** BR 3001(f) provides:

"A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim."

**14.** The court is to allow a claim except to the extent that

*Discovery*

31. The following documents, among others, were produced by the Debtors or Tishman in connection with this contested matter, and have been reviewed by or on behalf of NBC: general ledgers for the years 1989–1993, some vendor invoices for lease years 1989 through 1994, and vendor invoices for the years 1995 through July 17, 1996.

32. Many of the documents and files relating to Rockefeller Center had been put in storage by Tishman in a Pennsylvania warehouse. In May 1997 certain files related to the relevant lease years were destroyed by a fire at the warehouse.

## DISCUSSION

### Allowance of Claims

The allowance of claims is governed by Bankruptcy Code ("Code") § 502. Code § 502(a) states that a claim which is filed is deemed allowed unless a party in interest objects.[13] Once an objection to a claim is made the court, after notice and a hearing, is to determine the amount of the claim.[14] Once an objectant offers sufficient evidence to overcome the prima facie validity of the claim, the claimant is required to meet the usual burden of proof to establish the validity of the claim. *See* 9 Collier on Bankruptcy, 15th Ed. § 3001.09[2]; *In re Rockefeller Center Properties*, 241 B.R. at 817; *Matter of Fidelity Holding Co., Ltd.*, 837 F.2d 696 (5th Cir.1988); *In re Domme*, 163 B.R. 363 (D.Kan.1994).

"Such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable laws for a reason other than because such claim is contingent or unliquidated* * *" Code § 501(b)(1).
The court must look to state law to determine the allowability of a claim.

When an objection to a claim is contested, a contested matter is created.[15] BR 9014 dictates the procedure to be followed in contested matters. A number of the rules found in Part VII of the Bankruptcy Rules which apply in adversary proceedings are made applicable to contested matters. BR 7056 which adopts FRCP 56 is made explicitly applicable. NBC has objected to the Reorganized Debtors' joinder of its objection to the Proof of Claim with a motion for partial summary judgment. While certainly unusual, the procedure adopted by the Reorganized Debtors actually provided NBC with more information about the nature of the objection made to its claim than the typical objection does.[16] The court can find no prejudice to NBC from the procedure adopted since consideration of a motion for partial summary judgment is governed by well-established case law in addition to the explicit standards set forth in FRCP 56.

### Summary Judgment Standards

FRCP 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

A fact is material only if it affects the result of the proceeding and a fact is in dispute only when the opposing party submits evidence such that a trial would be required to resolve the differences. *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir. 1975), *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976); *In re CIS*, 214 B.R. 108, 118 (Bankr.S.D.N.Y.1997). The court's function when faced with a motion for summary judgment is to determine whether there exist any genuine issues of material fact to be tried, and not to resolve any factual disputes. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248–49, 106 S.Ct. 2505; *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir.1996); *Schering Corp. v. Home Insurance Co.*, 712 F.2d 4, 9 (2d Cir.1983).

In ruling on a motion for summary judgment, the court is required to draw all factual inferences in favor of, and take all factual assertions in the light most favorable to, the party opposing summary judgment. *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 36 (2d Cir.1994). If the moving party meets its burden, the burden shifts to the nonmoving party to come forward with affidavits, depositions, or other sworn evidence setting forth specific facts showing that there exists a genuine issue of material fact. *Rule v. Brine*, 85 F.3d at 1011; *accord* FRCP 56(e). The nonmoving party must do more than simply show that there is some metaphysical

---

**15.** Although one might view an objection to a claim by itself as creating a contested matter, the reality is that the vast majority of claims objections are uncontested.

**16.** This court does note that the procedure utilized by the Reorganized Debtors did have an aspect that this court does find objectionable. In a single document, the Reorganized Debtors joined their motion for partial summary judgment to their objection to the claims filed by NBC and The Chase Manhattan Bank. *See generally In re Rockefeller Center Properties, Inc.*, 241 B.R. 804, *supra*. These two claims, while raising similar legal issues, have been filed by wholly unrelated parties and stand or fall on their own facts. Separate papers as to each claimant would have much expedited the hearing and resolution of the objections.

doubt as to the material facts. *Trans Sport, Inc. v. Starter Sportswear*, 964 F.2d 186, 188 (2d Cir.1992) (citations omitted).

The evidence favoring the nonmoving party must be more than merely colorable. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. A mere scintilla of evidence is not enough to create a genuine issue of fact. *Id.* at 252, 106 S.Ct. 2505. There must be evidence upon which a jury may reasonably rely and a party may not escape summary judgment on the mere hope that something will turn up at trial. *Id.; Ayers v. Pastime Amusement Company*, 283 F.Supp. 773, 793 (D.S.C.1968); *In re General American Communications Corporation*, 63 B.R. 534 (Bankr.S.D.N.Y.1986). The court can consider the content of all submitted affidavits in determining whether a proponent's affidavit is sufficient to give rise to a dispute as to material issue of fact. FRCP 56(e); *In re CIS*, 214 B.R. at 118. However, the nonmoving party may not simply rely on speculation, conclusory allegations and mere denials to raise genuine issues of material fact. *Nat'l. Westminster Bank v. Ross*, 676 F.Supp. 48, 51 (S.D.N.Y.1987); *United States v. 15 Black Ledge Drive*, 897 F.2d 97, 102 (2d Cir.1990)(bare denials are insufficient to create a genuine triable issue of fact). The nonmoving party is also required to put forth all of its evidence or risk the grant of the motion for summary judgment.

■ Of course, when evaluating whether a fact is material to the appropriate legal doctrines, it is essential to determine what facts must be proven to sustain a cause of action or defense. The doctrine of account stated relied on by the Reorganized Debtors may be established by way of summary judgment. *See, e.g., Kramer Levin Nessen Kamin & Frankel v. Aronoff*, 638 F.Supp. 714 (S.D.N.Y.1986); *Ally & Gargano, Inc. v. Comprehensive Accounting Corp.*, 615 F.Supp. 426 (S.D.N.Y.1985); *In re Shea & Gould*, 198 B.R. 861 (Bankr. S.D.N.Y.1996).

### The Doctrine of Account Stated

■ Under New York law, an account stated is "an 'agreement between the parties to an account based upon prior transactions between them with respect to the correctness of the separate items composing the account and the balance due, if any, in favor of one party or another.'" *Kramer Levin*, 638 F.Supp. at 719 (*citing Chisholm–Ryder Co., Inc. v. Sommer & Sommer*, 70 A.D.2d 429, 431, 421 N.Y.S.2d 455, 457 (1979)); *see also Ally & Gargano*, 615 F.Supp. at 428. Under this doctrine, a party who receives an account is bound to examine it, and if that party admits that the account is correct, it becomes a stated account and is binding on both parties. *Id.; Lockwood v. Thorne*, 11 N.Y. 170, 174 (1854); *Kay Collyer & Boose v. International Film Productions, Inc.*, 1985 WL 3962, *1 (S.D.N.Y.1985). Express assent to the account is not necessary. Such assent may be inferred by silence when an account rendered remains unquestioned a reasonable time after receipt. *Willard Helburn, Inc. v. Spiewak*, 180 F.2d 480, 483 (2d Cir.1950)("when an account * * * remains unquestioned for a reasonable time after its receipt that fact is evidence * * * that the account as rendered has been accepted as correct"); *Navimex S.A. De C.V. v. S/S "Northern Ice"*, 617 F.Supp. 103, 106 (S.D.N.Y.1984); *Rosenman Colin Freund Lewis & Cohen v. Neuman*, 93 A.D.2d 745, 461 N.Y.S.2d 297, 298–99 (1st Dep't.1983). An agreement to pay an indebtedness may also be implied if the objecting party makes a partial payment. *Kramer Levin*, 638 F.Supp. at 720.

■ If an account stated is established, the agreement is binding on both parties and must be enforced at law, al-

though an account stated "can always be opened upon proof of mistake or fraud." *American Home Assurance Co. v. Instituto Nacional De Reaseguros*, 1991 WL 4461, *3 (S.D.N.Y.1991). The doctrine of account stated may be raised by a plaintiff seeking to recover from an account obligor or by a defendant seeking to prevent the reopening of a paid account, as is the case here. As the Reorganized Debtors have made out a *prima facie* case for application of the account stated doctrine to bar recovery of the payments long since made to it, it is NBC who bears the burden of establishing that its Proof of Claim for the years 1989 through 1993 is not barred. *American Home*, 1991 WL 4461, *3; *In re Rockefeller Center Properties*, 241 B.R. at 819.

 NBC urges that it may reopen the amount of the Additional Rent paid under the NBC Lease for the five year period 1989–1993 because the Reorganized Debtors allegedly made mistakes in the calculation of the Additional Rent due. In the Proof of Claim, NBC failed to specify or identify any mistakes which it believed the Reorganized Debtors had made in the calculation of the Additional Rent. NBC made no allegations of fraud. Rather, the Proof of Claim merely set forth the conclusory allegation that NBC had overpaid rent without providing any basis for its calculations. NBC has offered factual affidavits in opposition to the motion for partial summary judgment which it claims establishes that NBC had knowledge of mistakes sufficient to reopen the paid accounts stated *prior to* filing the Proof of Claim. However, these affidavits do no such thing. Rather, they demonstrate that any mistakes or errors discovered by NBC prior to the filing of the Proof of Claim were resolved between the parties. NBC also extensively relies on the Preliminary BDO Seidman Report which was not even prepared until *after* the Proof of Claim was filed.[17]

---

17. At oral argument, the court raised the question as to whether NBC's failure to specify any mistake or fraud in its Proof of Claim gave the court a basis to dismiss the Proof of Claim under FRCP 9(b), which provides:

"In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally."

To pass muster under FRCP 9(b), allegations must specify the time, place, speaker and content of the alleged fraud or mistake so that the intent to defraud is evident. *Ross v. Bolton*, 904 F.2d 819, 823 (2d Cir.1990); *DiVittorio v. Equidyne Extractive Industries, Inc.*, 822 F.2d 1242, 1247 (2d Cir.1987).

Similar specificity is required in an action in the New York state courts. NYCPLR Rule 3016(b) provides:

"(b) Fraud or mistake. Where a cause of action or defense is based upon misrepresentation, fraud, mistake, wilful default, breach of trust or undue influence, the circumstances constituting the wrong shall be stated in detail."

A proof of claim is a special form of complaint against a debtor. Form 10 sets forth what is required in a proof of claim. What Form 10 requires is remarkably similar to FRCP 8(a)(2) which requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FRCP 9, which is adopted by Bankruptcy Rule 7009 and applies to adversary proceedings, seems appropriately applied to proofs of claim as well.

In one bankruptcy case with respect to a complicated claim based on allegations of fraud and misconduct, the court required the claimant to refile the claim in the form of an adversary proceeding in order to bring some procedural regularity to bear on the issues so they could move forward to determination. *See In re Maxwell Newspapers, Inc.*, 151 B.R. 63, 68 (Bankr.S.D.N.Y.1993) (Bankruptcy Rule 9014 held to grant discretion to court to direct parties to bring what would otherwise be a contested matter in the form of an adversary proceeding.) In this matter there is no necessity for the court to direct the commencement of an adversary proceeding.

■ Alternatively, NBC seeks to defeat the Reorganized Debtors' account stated defense by arguing that it is not really seeking to adjust an account stated but rather it is suing for breach of contract based on the Reorganized Debtors' alleged breach of its Lease by the inclusion of improper charges in the calculation of the Additional Rent. Thus, NBC argues that its claims cannot be barred because they were asserted within the six year contract statute of limitation. *See* NYCPLR § 213(2). The court finds this line of argument unpersuasive since it is well settled in New York that the account stated doctrine bars breach of contract claims.

■ In *Marino v. Watkins,* 112 A.D.2d 511, 512, 490 N.Y.S.2d 917, 919 (3rd Dep't. 1985), the defendant attempted to defeat an account stated by asserting in a counterclaim that the plaintiff, the operator of an accounting agency, had breached the underlying services contract by her failure to obtain the prior approval of the defendant of her ad purchases and in failing to adhere to his guidelines. The Appellate Division rejected this attempt to evade the account stated doctrine and held:

> "Having accepted and paid for plaintiffs services and having accepted and retained the bills for the unpaid services without objection for several months, and no equitable considerations to the contrary being present, plaintiff's account must be considered conclusive* * *. This determination renders the corporate defendant's counterclaim [for breach of contract] legally insufficient."

112 A.D.2d at 513, 490 N.Y.S.2d at 919. *See also American Home,* 1991 WL 4461, *5 n. 1 ("breach of contract is not available to defendant as a means to seek adjustment of an account stated"); *accord, Kramer Levin* (client's failure to object to account stated bars defense of inadequate representation in collection of suit by law firm). The court also finds that NBC cannot have a claim in quasi contract for money had and received, since quasi contract is not available where there is a written contract and the Lease is written contracts. *See Clark–Fitzpatrick, Inc. v. Long Island Railroad Co.,* 70 N.Y.2d 382, 388, 521 N.Y.S.2d 653, 656, 516 N.E.2d 190 (1987).

*NBC Failed to Object to the Escalation Statements within a Reasonable Time*

■ It is well settled that the court can determine on summary judgement what constitutes a "reasonable time" to object to a statement of account. *See Kramer Levin,* 638 F.Supp. at 720 (granting summary judgment where almost three years passed before a bill was questioned "such a period of silence—in which there was ample opportunity to object to the billing—amounts to an implied acquiescence to the stated account"); *Kay Collyer,* 1985 WL 3962 at *2 (granting summary judgment where "it is clear that [the defendant] cannot raise a genuine issue of fact with respect to this sum by now disputing what it acknowledged and assented to before this lawsuit was commenced"); *Rosenman Colin,* 461 N.Y.S.2d at 299 (defendant's "belated objections insufficient to raise genuine issues warranting denial of summary judgment"). *See also, Lockwood v. Thorne,* 11 N.Y. 170 (1854)("If this case rested upon the question of reasonable notice, I cannot doubt, but the lapse of

Since there is a pending motion for partial summary judgment, this court need not determine whether the Proof of Claim would pass muster under FRCP 9. Whether or not NBC was required to plead fraud or mistake with particularity in its Proof of Claim, it is indisputable that it was required to put forth all of its evidence of fraud or mistake in opposition to the motion for partial summary judgment.

nine months after receiving the account, before the commencement of the action, there having been made, in the meantime, no objection or complaint, would have been abundant to authorize the legal inference of acquiescence * * * ").

In determining what constitutes a reasonable objection period in this case, the court need only look at the NBC Lease in which the parties themselves elected to have a six month period during which NBC had the right to request substantiation and verification or to conduct an audit after receipt of any Escalation Statement.

The NBC Lease contains provisions which clearly state that the estimated Additional Rent payments to be made during the lease year are due and payable "promptly" upon receipt of a bill from the Landlord and that the final adjusting Additional Rent payment is also due and payable "promptly" upon receipt of the Escalation Statements. *See* Finding 11. Assuming the facts most favorable to NBC, the court finds that by waiting until the filing of the Proof of Claim in September 1995 to object to the 1989–1992 [18] Additional Rent fixed in the Escalation Statements, NBC did not make timely objections as required to preserve their rights.

The court holds that no objection to the final amount of the Additional Rent fixed in the Escalation Statements and actually paid would be timely after the conclusion of the six month period following receipt of the annual Escalation Statement and that the account stated doctrine would preclude any recovery of the Additional Rent payments thereafter. Firstly, any Additional Rent payment due under the Escalation Statement was required to be made *promptly* after the receipt of the statement. Secondly, after the end of the current lease year, a new Escalation Statement needed to be prepared, the amount of the final Additional Rent fixed and the difference determined so that the Additional Rent could be fixed for that year and the estimated rent for the upcoming year could be established. By the Filing Date, all of the Escalation Statements which fixed the final amount of the Additional Rent for the years 1989–1992 had become accounts stated. *In re Rockefeller Center Properties*, 241 B.R. at 821 (claimant's failure to object to Escalation Statements after 1–4 years was not timely); *Navimex*, 617 F.Supp. at 106 (defendant's failure to object for 5 months to plaintiffs' summary statement of account was unreasonable and converted the bill into an account stated); *American Home*, 1991 WL 4461 (granting summary judgment where account debtor failed to object to quarterly account statement prior to litigation); *In re Shea & Gould*, 198 B.R. 861 (Bankr.S.D.N.Y.1996)(objection after 23 months was not timely); *Dreyer and Traub v. Rubinstein*, 191 A.D.2d 236, 594 N.Y.S.2d 257 (1993) (defendant who did not object to law firm's bill for over 1 year deemed to have accepted it); *Jim–Mar Corporation v. Aquatic Construction, Ltd.*, 195 A.D.2d 868, 870, 600 N.Y.S.2d 790, 792 (3rd Dep't 1993)(account stated found where plaintiff rendered an account 6 months before defendant voiced objection); *Parola v. Lido Beach Hotel, Inc.*, 99 A.D.2d 465, 465, 470 N.Y.S.2d 44, 46 (2d Dep't 1984) (defendant's failure to object to the amount due for 1 year after the first account was rendered created a presumption as to the account's validity); *Fink, Weinberger, Fredman, Berman & Lowell, P.C. v. Petrides*, 80 A.D.2d 781, 437 N.Y.S.2d 1 (1st Dep't 1981) (summary judgment was warranted against a defendant who offered no evidentiary allegations

---

18. The court will discuss open objections to lease year 1993 separately.

supporting his position that he had contested a bill issued over 1 year earlier); *L.K. Comstock & Co., Inc. v. Duffy*, 43 A.D.2d 704, 704, 350 N.Y.S.2d 9, 12 (2d Dep't 1973) (defendant's silence for many months effected an account stated).

*NBC's Prior Settled Disputes Do Not Operate as Blanket Objections*

■■ NBC argues that its past reviews and audits operate as blanket objections to the lease years at issue because its accounting reviews and audits were not comprehensive and that when NBC paid its Additional Rent it had no idea that it was being overcharged. In support, NBC cites *Westinghouse Elec. Corp. v. Lyons*, 125 N.Y.S.2d 420, 422 (N.Y.Sup.Ct.1953), aff'd. 1 A.D.2d 770, 149 N.Y.S.2d 212 (1st Dep't 1956) for the proposition that audits do not themselves create an account stated. The court finds NBC's argument unpersuasive and that NBC's reliance on *Westinghouse* is misplaced. *Westinghouse* involved evidence of fraud, where the account debtor admitted its monthly reports were false and that it had concealed its fraud from the debtor. Because the element of fraud was present, the court found that a sufficient opportunity for any acceptable audit was not presented. Here, NBC has failed to make any allegations of fraud, much less concealment. Moreover, in *Westinghouse,* the account creditor and account debtor had a fiduciary relationship, which is certainly not the case here.

In this case, from 1989 through 1992, NBC reviewed and/or audited any discrepancies it uncovered in the Escalation Statements and NBC's own affidavits and exhibits establish that each objection raised was of a limited nature and all of NBC's objections to Additional Rent calculations were resolved to its satisfaction.

In 1991 NBC conducted an audit of lease year 1990 in which it discovered that it was *underbilled.* The Landlord waived its right to collect the balance owed and NBC paid the Additional Rent set forth in its 1990 Escalation Statement without objection. In lease year 1992, following a review of the "rent billings" and "operation escalations" prepared by the Landlord, NBC's Manager of Finance completed a spreadsheet which identified two errors. These errors were corrected by the Landlord and NBC was issued a credit. NBC paid the Additional Rent set forth in its lease year 1992 Escalation Statement without further objection. NBC's only other objections for charges for lease years 1989 through 1992 were to extra tenant services which were *not* part of the Additional Rent calculations.

It is therefore undisputed that NBC (i) paid the estimated Additional Rent for each lease year through 1992; (ii) received and paid the amounts shown on the Escalation Statements through 1992; (iii) had officers responsible for examining the Escalation Statements; (iv) resolved to its satisfaction any specific objections it raised in connection with the Escalation Statements through 1992; and (v) upon the resolution of its objections, expressed no further substantive protest at the time it made its Additional Rent payments.

■■ Under the account stated doctrine all items that could have been, but were not, disputed are deemed settled because "if certain items in an account [rendered] are objected to within a reasonable time, and others not, the latter are to be regarded as covered by such an admission" that is, that they are "prima facie correct." *Wiggins v. Burkham,* 10 Wall. 129, 77 U.S. 129, 19 L.Ed. 884 (1869); *Telebase Systems, Inc. v. Gateway Communications, Inc.,* 1988 WL 21845, 1988 U.S. Dist. Lexis 1829 (E.D.Pa. March 2, 1988)("The law is settled that an understanding with respect to a portion of an open account may act as a partial account stated, to the extent of

the understanding"); 1 Am.Jur.2d Accounts and Accounting § 28 at 586 (1994)("the mere fact that one or more items in an account are disputed does not prevent the account from becoming an account stated as to all the items admitted to be correct"). NBC was "bound to examine the statement and object to it, if objection there be." *American Home*, 1991 WL 4461, *3; *Chisholm–Ryder*, 421 N.Y.S.2d at 457. NBC did not satisfy this obligation.

The court holds that NBC's acceptance of the Escalation Statements for lease years 1989 through 1992, the resolution of all objections, the payment of the Additional Rent set forth in the lease year 1989 through 1992 Escalation Statements together with the exercise of NBC's audit rights created stated accounts for lease years 1989 through 1992.

*Certain Charges in Lease Year 1993 Remain in Dispute*

■ NBC received its 1993 Escalation Statement on or about February 14, 1994. During the summer of 1994 NBC conducted an audit and reviewed the accounting for the Additional Rent. NBC objected to certain charges in the Escalation Statement, including, its proportionate share of building costs following the sale of the Time Warner Building and certain equipment expense categorizations. In protest of charges which it deemed excessive, NBC withheld a portion of its 1993 Additional Rent payment, which payment has not yet been paid.

Because NBC objected to the charges in the lease year 1993 Escalation Statement, which objections have not been settled by the parties, the court cannot resolve on summary judgment the proper amount of the charges to be included in the lease year 1993 Escalation Statement. The court therefore finds that the 1993 Escalation Statement was not finalized and does not fall within the ambit of the account stated doctrine.

*NBC has Failed to Establish Any Reason to Re–Open the Settled and Paid Escalation Statements*

■ Although NBC's contractual rights required a request for "verification" and "substantiation" during the six month period following receipt of each Escalation Statement, NBC places significant emphasis on the fact that the parties had previously re-examined past bills for extra service charges and settled any objections at times, years after the bills had been rendered and paid. NBC asserts that this practice created a course of conduct between the parties which allowed that any paid bill, including any past paid Escalation Statement, would remain open to challenge and could be reopened for review for an indefinite period of time.

In essence then, NBC argues that because its belated objections to extra tenant service charges were resolved long after the bills had been paid, its right to object to Escalation Statements years after their payment had also been preserved.[19] The

---

**19.** NBC states that after it received its Escalation Statement for lease year 1991 it discovered that it was billed for a flat number of hours rather than for actual usage in one of NBC's elevator banks from March 1989 through July 1991. NBC provided correspondence which establishes that the Landlord reviewed these belated objections and issued a credit in its favor. However, elevator charges were not part of the Escalation Statement.

In 1992 NBC made a "payment against account" of $250,000 for extra elevator service charges that it had withheld from December 1988 through December 1992.

Following the lease year 1993 audit, NBC objected to charges for extra elevator service and chilled water charges for additional air conditioning services, as identified in its Proof of Claim. NBC has provided correspondence which establishes that any dispute over the

court disagrees. It is clear from the NBC Lease, and the parties do not dispute, that extra or additional charges for certain services are not billed as part of the Cost of Operation and Maintenance calculated in the Additional Rent, but are billed separately to NBC in consideration of its actual use of those services. Thus, the Escalation Statement calculations are totally separate and distinct from the extra service charge calculations. The Escalation Statements concern NBC's proportionate share of maintenance and operation expenses common to all tenants in the Rockefeller Center complex. The extra service charges are specific to NBC and are calculated based solely on NBC's actual use of the service. NBC has not offered any evidence that any objection to an Escalation Statement was brought to the Landlord's attention and resolved years after the bill was paid. Moreover, the NBC Lease clearly sets forth all of the obligations of the parties as to the right to audit and object to the Escalation Statements.

▆▆▆▆ The Second Circuit has held that summary judgment is appropriate even when the issue is a contract's proper construction, so long as the words of the contract convey a definite and precise meaning absent any ambiguity. *Lazard Freres v. Protective Life Insurance Company*, 108 F.3d 1531 (2d Cir.1997). A writing is unambiguous when, construing it as a whole and giving each section its plain meaning, the writing is susceptible to only one interpretation. *In re Sturman*, 222 B.R. 694, 705 (Bankr.S.D.N.Y.1998). If a writing is clear and unambiguous on its face, its meaning must be determined from the four corners of the instrument without resort to extrinsic evidence. *Id.; In re CIS*, 214 B.R. 108, 120 (Bankr.S.D.N.Y.

1997); *See also Goodheart Clothing Company, Inc. v. Goodman Enterprises, Inc.*, 962 F.2d 268, 272 (2d Cir.1992)(plain meaning should govern the interpretation of the agreement without resort to extrinsic evidence of any nature). It is axiomatic therefore that a contract is to be interpreted so as to give effect to the intent of the parties as expressed in the unequivocal language employed. *In re Sturman*, 222 B.R. at 705. Moreover, it is well settled in New York that the threshold decision on whether a writing is ambiguous is the exclusive province of the court. *Id.; In re Hooker Investments*, 145 B.R. 138, 143 (Bankr.S.D.N.Y.1992), *citing, Sutton v. East River Savings Bank*, 55 N.Y.2d 550, 554, 450 N.Y.S.2d 460, 462, 435 N.E.2d 1075, 1077 (1982).

▆▆▆ In the instant matter the NBC Lease is a key material fact and no party disputes its existence or content. The parties do disagree about the interpretation of the effect of the audit provisions contained therein. This characterization, however, is an issue of law not fact and the language of a contract is not made ambiguous simply because the parties urge different interpretations. *Seiden Associates, Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir.1992).

The court finds the NBC Lease to be plain on its face and that Article 21 clearly, explicitly and unambiguously provides that any request for "verification" or "substantiation" be made "within 6 months following the receipt by it of an Escalation Statement." For this audit provision to have any meaning, it must be interpreted to mean that the account would be settled after the performance of any audit requested during the contractual six month window. This is particularly so since the

---

extra elevator charges through July 1993 has been resolved. Again, it is noted that elevator

charges were not part of the Escalation Statement.

Landlord was only obligated to retain the relevant records in accordance with its customary practice. There is no obligation for the Landlord to retain the relevant records for an indefinite period of time.

The NBC Lease clearly, explicitly and unambiguously provides that the forbearance of the Landlord to enforce any contractual right under the NBC Lease "*shall not* be construed as a waiver or relinquishment for future performance" of the right not enforced. (Emphasis added). Even assuming that Landlord had on occasion made an exception to this provision, which has not been shown, such an exception would not waive the Landlord's right to rely on the six month audit provision for Escalation Statement objections.

Finally, the NBC Lease also clearly, explicitly and unambiguously provides that any amendment to the NBC Lease be made in writing. NBC has provided no evidence of any written amendment altering the terms of its Lease to provide for a change in the audit provision. Therefore the court finds that no prior course of conduct alters the requirements set forth in the NBC Lease and that any accounts which were challenged and resolved, without any specific reservation of rights for further review, became accounts stated and are not open to any further challenge.[20]

■ Alternatively, NBC suggests that its contractual audit rights were not its exclusive remedy for correcting escalation overcharges. In support, NBC points to the NBC Lease provision which makes

non-payment of rent a default under its Lease. NBC states that it was bound to "pay now and fight later" even after the six month audit period had expired. Again, the court disagrees.

Upon receipt of an Escalation Statement, NBC could have promptly paid the Additional Rent as billed (under protest or with some other reservation of rights) and then requested an audit within the six month audit period. The court finds that the audit provision is not optional, but rather, is a binding commitment to timely object to the Escalation Statements. Moreover, NBC's conceded conduct belies its assertion, since NBC withheld payment of Additional Rent for lease year 1993 pending the reconciliation of amounts it protested.

■ Finally, NBC argues that it can re-open the payments of the Additional Rent during 1989–1993 due to a number of errors it claims have been recently discovered by BDO Seidman in the computation of the Additional Rent. NBC attributes these errors to (i) the Reorganized Debtors' accounting methods and (ii) the improper inclusion of certain operational expenses. It was always available to NBC to prepare retrospective analyses to determine the actual amount and rate of change in the Escalation Statements and to request further information of the Reorganized Debtors. It did not need an outside accountant to come in years later to do this. Moreover, the NBC Lease provided for the Reorganized Debtors to charge the

---

**20.** In any event, the court finds the cases NBC cites in support of its position not on all fours. While the cases cited by NBC analyze what effect the course of conduct between the parties has on the determination of whether an account is stated and final, none of these cases involve a situation where the parties negotiated a specific contractual provision limiting the permissible time period for exam-

ining the account and objecting thereto. *See Rosenman Colin; Lockwood v. Thorne; Kay Collyer; Kramer Levin; Navimex; American Home; Fink Weinberger; L.K. Comstock; Shea & Gould; Dreyer and Traub; Jim–Mar Corporation; Parola, supra. See also South Ferry Building Co. v. J. Henry Schroder Bank & Trust Co.*, 122 Misc.2d 595, 473 N.Y.S.2d 94 (1st Dep't 1983).

tenants with their pro rata share of the increase from their respective Base Years of the "*actual cost * * * incurred by the Landlord* with respect to the operation, maintenance and repair of [Rockefeller] Center." (emphasis added). Although certain permitted operating expenses are explicitly listed in the NBC Lease, the NBC Lease provides that the list is not exhaustive. *See* Finding 12. The court finds that even if NBC is correct, it has waited too long and has not sufficiently pled its case to challenge the settled and paid 1989–1992 Additional Rent under the NBC Lease. The account stated doctrine precludes all disputes except for the narrow category of factual mistakes or fraud. *American Home*, 1991 WL 4461, *3. NBC has failed to meet its burden in establishing the sort of mistakes cognizable in law to support an adjustment of the stated accounts.[21]

*NBC Failed To Make A Further Effort To Determine its Obligations after Objections were Resolved*

 NBC argues that it only recently discovered that it had been overcharged and that it had paid the alleged over-

charges because at the time the Escalation Statements were rendered, "NBC did not know all of the costs that were included in the [Cost of Operation and Maintenance]" and that NBC "did not know about the overcharges that are the subject of NBC's claims." Hirsch Affidavit ¶ 8. NBC states that because the Escalation Statements only set forth the square footage upon which the Reorganized Debtors made their calculations and do not refer to the composition or calculation of the cost escalation, which facts they claim are within the Reorganized Debtors' possession and control, NBC should be permitted to re-open and adjust the settled accounts.

The Reorganized Debtors' respond that NBC has misapprehended the law and has grossly underestimated the limitations it faces as the party seeking to challenge the settled and paid accounts. The Reorganized Debtors point out that NBC has failed to put forward any facts showing that the Reorganized Debtors made intentional misrepresentations or committed fraud in calculating the Additional Rent under the NBC Lease. Moreover, they argue, NBC's claim that it did not have full

---

**21.** Another limitation on the ability to rebut or impeach an account stated is that once a failure to object gives rise to an account stated, the objecting party may no longer contest the accounting method which was used throughout the relationship without protest. The objecting party in such circumstances is limited to proving factual mistakes within the context of an accounting method it is no longer entitled to challenge. *American Home*, 1991 WL 4461, *3; *Navimex*, 617 F.Supp. at 106. Even if the objecting party succeeds in showing that more restricted sort of error, its effect is to entitle it to an appropriate adjustment in the account stated; such errors do not operate to bar the entire account stated. *Id.*

While the court need not reach this issue, the court notes that even assuming that the Reorganized Debtors did erroneously charge to overhead some of the items NBC sets forth,

many of those identified are *de minimus*, and in most sophisticated transactions there will always be some undetected errors or differences in opinion concerning an accounting. Moreover, when the parties' relationship extends over a long period of time, as it has here, it is not unusual for accounting categories and styles to change with the changes in personnel and management. However, such an attack is not enough to allow a settled account to be re-opened. The law is clear that a court will not dismiss an account stated merely because the accounts are not perfect in every respect. *Navimex*, 617 F.Supp. at 105 ("[e]ven if the [objecting party] succeeds in showing that more restricted sort of error [a factual mistake], its effect is to entitle [it] to an appropriate adjustment in the account stated; such errors do not operate to bar the entire claim of an account stated").

knowledge of the facts is disingenuous because NBC had the opportunity to review the supporting documents, and it chose not to do so. Under the circumstances, the Reorganized Debtors argue, the Escalation Statements are sufficient to establish an account stated since NBC "had full knowledge or [was] offered an opportunity to gain such knowledge of all of the true facts and circumstances." *Westinghouse Electric*, 125 N.Y.S.2d at 422. The Reorganized Debtors cite to *Gimbel Bros., Inc. v. Brook Shopping Centers, Inc.*, 118 A.D.2d 532, 499 N.Y.S.2d 435 (1986) in support of their proposition.

In *Gimbel Bros.*, Gimbels sought a declaratory judgment that it could properly set off $20,000 in "Sunday charges" that it had paid against future rents due under a lease for its store premises in the Cross County Shopping Center in Yonkers, New York. Although it had no duty to do so under its lease, Gimbels paid those charges which were assessed as fees by the landlord for opening the store on Sundays after the repeal of a prior ordinance that prohibited Sunday store openings. Gimbels claimed that it was entitled to restitution of the charges because they were made pursuant to a mistake of fact. The court rejected that argument, finding that the "payments of $825 per Sunday were made voluntarily, without protest, and that no mistake of fact was involved." 118 A.D.2d at 534, 499 N.Y.S.2d at 435. It then considered whether Gimbels was entitled to restitution under the theory that such payments were made pursuant to a mistake of law:

> "The traditional rule is that a voluntary payment made with full knowledge of the facts cannot be recovered because it was made pursuant to a mistake of law * * *. The harshness of this absolute rule was ameliorated by the enactment of CPLR 3005, which provides that 'when relief against a mistake is sought in an action * * * such relief shall not be denied merely because the mistake is one of law rather than fact * * * ' However, in *Mercury Mach. Importing Corp. v. City of New York*, 3 N.Y.2d 418, 429, 165 N.Y.S.2d 517, 144 N.E.2d 400 [ (1957) ], it was held that the foregoing statute 'does not require that mistakes of law shall be treated in all instances as though they were mistakes of fact.' Clearly, then, a party is not automatically entitled to relief simply because that party acted under a mistake of law * * *. *[W]e find that the weight of the evidence supports the conclusion that Gimbels was not operating under an actual mistake of law but, instead, made the subject payments voluntarily, as a matter of convenience, without having made any effort to learn what its legal obligations were.* * * * *Gimbels displayed a marked lack of diligence in determining what its contractual rights were, and is therefore not entitled to the equitable relief of restitution.*"

*Id.* at 535–36, 499 N.Y.S.2d at 435, (emphasis added).

The court finds that NBC has displayed the same "marked lack of diligence" with respect to determining what its contractual rights and obligations were under the NBC Lease. NBC's officers responsible for reviewing the Additional Rent and Escalation Statements admitted that they received and paid the invoices for years, resolving all but certain of the lease year 1993 objections to its satisfaction. NBC argues that it was not fully aware of the magnitude of any billing errors because it did not have knowledge of all of the facts underlying the Additional Rent calculations. The court finds that the only reason that NBC did not have full knowledge of the facts is because it made little effort to determine what the facts were. That NBC failed to perform what it would con-

sider a "full scale" audit or accounting review is its own fault. It is not enough that NBC show an overpayment. NBC must show a mistaken overpayment which it has failed to do. NBC is not entitled to the equitable relief of restitution for the lease years 1989–1992.

### The Doctrine of Estoppel In Pais

■■■■■ The doctrine of estoppel in pais bars an account debtor's claims "if the [account] debtor by its failure to object or inquire within a reasonable time places the creditor in a worse position than if timely protest or inquiry had been made." *American Home*, 1991 WL 4461 *3. It is hornbook law that an account stated may not be impeached where "some act has been done or forborne in consequence of the accounting and in reliance upon it, which would put the party claiming the benefit in a worse position than if it had not been had, so as to bring the case within the principles of estoppel in pais." *See* N.Y.Jur.2d Accounts and Accounting Sect. 22 at 173 (1979); Restatement (Second) Contracts Sect. 90 (1979); *In re Rockefeller Center Properties*, 241 B.R. at 826.

In the instant case, the Reorganized Debtors are prejudiced in a number of ways by the failure of NBC to make timely objections to the Additional Rent calculations for lease years 1989–1992. They conducted their operations based on the receipt of the Additional Rent and the monies paid have long been spent and incorporated into future revenue and expense projections. Fading memories and departed employees would make it difficult for the Reorganized Debtors to go back and review the Additional Rent calculations reflected in the Escalation Statements. These factors are all the more significant since the Reorganized Debtors no longer have any relation to the Property and no longer have custody of the supporting records, which are now held by Tishman Speyer, the managing agent for the new owner of the Property. To allow five years of stale accounting data to be re-opened based on unspecified errors grounded merely on suspicion would severely prejudice the Reorganized Debtors.

■■■■ NBC is a sophisticated tenant.[22] The Reorganized Debtors were entitled to expect that after all the Additional Rent for a particular lease year was paid, any request for an audit would be made within six months of NBC's receipt of an Escalation Statement. NBC is barred by the doctrine of estoppel in pais from challenging the paid accounts stated because its failure to act in a timely fashion places the Reorganized Debtors in a substantially worse position than they otherwise would have been in.

### There is No Need for Further Discovery

■■■■ NBC seeks to delay consideration of the Reorganized Debtors' motion for partial summary judgment until it has had completed discovery in respect of lease years 1989–1993 so that it can be able to accurately ascertain the full nature of its claims. However, NBC, by its own admission has already conducted audits or accounting reviews of Additional Rent calculations for lease years 1990, 1991, 1992 and 1993. NBC now seeks to launch a wholesale fishing expedition through more than ten years of accounting records before the motion for partial summary judgment can be considered. NBC's request is governed by FRCP 56(f) which provides:

---

**22.** The court takes judicial notice of the fact that NBC's parent company, General Electric, is one of the largest companies in the world.

"Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just."

■ NBC has not filed a Rule 56(f) affidavit detailing what additional discovery is needed and why. The "failure to file an affidavit under Rule 56(f) is itself sufficient ground to reject a claim that the opportunity for discovery was inadequate." *Paddington Partners v. Bouchard,* 34 F.3d 1132, 1138 (2d Cir.1994); *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.,* 769 F.2d 919, 926 (2d Cir.1985).

In *Burlington Coat,* The Second Circuit held that FRCP 56(f) requires that the opponent of a motion for summary judgment who claims to be unable to produce evidence in opposition to the motion file an affidavit explaining:

"1. The nature of the uncompleted discovery, i.e., what facts are sought and how they are to be obtained; and

2. How those facts are reasonably expected to create a genuine issue of material fact; and

3. What efforts the affiant has made to obtain those facts; and

4. Why those efforts were unsuccessful." 769 F.2d at 926

■ The court must also take into account whether the party seeking additional discovery is the plaintiff or the defendant. Here, NBC is effectively the plaintiff. NBC has not shown what efforts it made to obtain the facts necessary to support its own claim prior to the filing of the Proof of Claim. For example, NBC has not offered any evidence that explains how, prior to the filing of the Proof of Claim, it came to believe the calculations of the Additional Rent were wrong or even how the amount of the claim was calculated.

The burden of proof lies with NBC. It is a burden NBC must meet without resorting to discovery from the Reorganized Debtors, just as it would have had to had it commenced an action in state or federal court against the debtors. The fortuity of the filing the Chapter 11 cases does not result in a shifting of the burden of proof. The Additional Rent having been paid, it is NBC that it suing for its recovery, albeit through the mechanism of filing a proof of claim. It is NBC that must demonstrate sufficient diligence to overcome the repose the account stated doctrine creates.

NBC cannot rely on speculation that further discovery from the Reorganized Debtors might uncover relevant evidence:

"[I]t is clear that a plaintiff cannot defeat a motion for summary judgment by merely restating the conclusory allegations contained in his complaint, and amplifying them only with speculation about what discovery might uncover. 'An opposing party's mere hope that further evidence may develop prior to trial is an insufficient basis upon which to justify the denial of the motion.'

\* \* \* \* \* \*

A 'bare assertion that the evidence supporting a plaintiff's allegation is in the hands of the defendant is insufficient to justify a denial of a motion for summary judgment under Rule 56(f). Rule 56(f) cannot be relied upon to defeat a summary judgment motion 'where the result of a continuance to obtain further information would be wholly speculative.'"

*Contemporary Mission, Inc. v. United States Postal Service,* 648 F.2d 97, 107 (2d Cir.1981) (citations omitted); *see also Paddington,* 34 F.3d at 1138 (discovery inap-

propriate where party opposing discovery seeks "to find out if it has a claim rather, than that it has a claim for which it needs additional discovery"); *Waldron v. Cities Service Co.,* 361 F.2d 671, 673 (2d Cir.1966)(denying Rule 56(f) discovery where "plaintiff sought to engage in still another 'fishing expedition' in the hope that he could come up with some tenable cause of action") aff'd. 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968).

When considering the Reorganized Debtors' motion for partial summary judgment, it is necessary to discuss the interplay between procedural and substantive law. In order to have an allowable claim, NBC must have a claim it could successfully establish under state law, as of the Filing Date. To file a suit, NBC would have had to comply with the requirements of FRCP 9 [23] which require the pleading of fraud or mistake with particularity in order to overcome the account stated doctrine. NBC would also have had to have complied with similar standards under NYCPLR Rule 3016(b). NBC would not have been able to file suit and then seek to have discovery to uncover its case.

NBC is speculating that additional discovery will turn up evidence of mistake or fraud, and therefore seeks to conduct an extensive and expensive fishing expedition to substantiate a mere hunch. NBC has actually had the benefit of some discovery and has failed to find mistake or fraud sufficient to take its claim outside of the barrier of the account stated doctrine. NBC has access to its own records and therefore needs no further discovery as to these records. In opposition to the motion for partial summary judgment, NBC was required to put forward its best evidence. All it has offered is evidence of resolved disputes from 1990 through 1992 and unresolved extra charges which are not even part of the Additional Rent calculations.

The court concludes that NBC has failed to satisfy the procedural requirements of FRCP 56(f) and is thus not entitled to an extension of time to take the discovery. However, more significantly, this court concludes that even if NBC had fulfilled the procedural requirements of FRCP 56(f), it still would not have been entitled to take additional discovery before consideration of the motion for partial summary judgment. As the putative plaintiff in a case based on mistake or fraud, NBC was required to plead with particularity. In defense to a motion for partial summary judgment, NBC was therefore required to offer the particulars of mistake or fraud without resorting to discovery.

### *CONCLUSION*

For the reasons set forth above, the court finds that there are no material facts in dispute as to the Escalation Statements for lease years 1989 through 1992 and as to those lease years the Reorganized Debtors' motion for partial summary judgment is granted. As to objections pertaining to lease year 1993, both as to the 1993 Escalation Statement and to the unresolved extra tenant charges, the court finds material issues of fact in dispute and denies the Reorganized Debtors motion.

Settle Appropriate Order.

---

**23.** NBC certainly had knowledge on which to base an opinion about the Additional Rent since it has been paying the amount for years and had a full historical record of the increased amounts.