**DUANE READE INC., Plaintiff–Counter–Defendant–Appellee,**

v.

**ST. PAUL FIRE AND MARINE INSURANCE COMPANY, Defendant–Counter–Claimant–Appellant.**

**Docket No. 03–9064.**

United States Court of Appeals, Second Circuit.

Argued June 14, 2004.

Decided June 22, 2005.

Charles Fried (Shaw Pittman LLP, Lon A. Berk, Edward J. Grass, Charles A. Cowan, and Stephanie P. Manson, McLean, VA, on the brief), Cambridge, MA, for Appellant.

James W.B. Benkard, Davis Polk & Wardwell (Carolina C. De Onis, Michael Farbiarz, and Jeffrey Brown, on the brief), New York, NY, for Appellee.

Before: WALKER, Chief Judge, B.D. PARKER and WESLEY, Circuit Judges.

JOHN M. WALKER, JR., Chief Judge.

This case involves an insurance dispute arising from the destruction of the World Trade Center by terrorists on September 11, 2001 ("9/11"). Plaintiff-appellee Duane Reade, Inc. ("Duane Reade"), which up until that day had operated its most profitable drugstore in the main concourse of the World Trade Center ("WTC"), filed this action against its insurer defendant-appellant St. Paul Fire & Marine Insurance Co. ("St.Paul"), seeking, *inter alia*, a declaratory judgment that its recovery for business interruption losses caused by the store's destruction will continue until the entire WTC complex is rebuilt. St. Paul countered that Duane Reade's business interruption coverage terminated 21 months after 9/11, the time St. Paul claims was reasonably necessary for Duane Reade to relocate its store to a new location and resume operations.

The United States District Court for the Southern District of New York (Jed S. Rakoff, *Judge*), issued a decision declaring, in part, that Duane Reade's recovery of business interruption losses would continue for the hypothesized time it would take for Duane Reade to rebuild its store and that "[o]nce Duane Reade could resume functionally equivalent operations in the location where its WTC store once stood, the [recovery for business interruption losses] would be at an end." *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 279 F.Supp.2d 235, 239 (S.D.N.Y.2003) ("*Duane Reade II*"). For the following reasons, we modify the district court's judgment to, *inter alia*, (1) eliminate any reference to "the location where [the] WTC store once stood," and (2) change "functionally equivalent operations" to "operations." *Id.* The judgment of the district court, as modified, is AFFIRMED.

## BACKGROUND

The relevant facts are straightforward and undisputed. Duane Reade owns and operates more than 200 drugstores in and around New York City, including 124 in Manhattan. Prior to 9/11, its single most profitable store occupied leased premises on the main concourse of the WTC. On 9/11, Duane Reade was insured under a $150 million property insurance policy written by St. Paul that covered (1) losses caused by damage or destruction to "Real and Personal Property," defined as all of Duane Reade's own property as well as any other property in Duane Reade's "care, custody, or control" or for which Duane Reade was legally liable; (2) several specified coverages, referred to as "Time Element" coverages, that indemnify Duane Reade for losses that arise initially from damage or destruction to Real and Personal Property, but which increase with the passage of time; and (3) certain "Extensions of Coverage" and supplemental coverages.

At issue in this appeal is the Time Element coverage for business interruption ("BI"), which indemnifies Duane Reade for lost earnings and expenses if Duane Reade's business is partially or totally interrupted as a result of a covered property damage. The parties dispute the measure of time during which Duane Reade may recover for BI losses stemming from the destruction of the WTC store. The relevant valuation provision, entitled "PERIOD OF RESTORATION AND/OR INDEMNITY," provides that recovery of BI losses "shall not exceed such length of time as would be required with the exercise of due diligence and dispatch to rebuild, repair, or replace such property that has been destroyed or damaged" (the "Restoration Period").

St. Paul asserts that it began to adjust Duane Reade's claim soon after 9/11 and has already paid Duane Reade for all of its property damage and business interruption losses. As to the latter, it paid $9.8 million to cover 9 months of lost profits "to locate, furnish and open a new drug store," and an additional 12 months of profits to compensate for the lowered profits Duane Reade is likely to receive once its store reopens.

Duane Reade, not surprisingly, takes a different position: it rejects the premise underlying St. Paul's calculations that coverage for business interruption losses extended only until Duane Reade could relocate its WTC store to an alternative location. Duane Reade therefore filed an action for breach of contract and a declaratory judgment in which it asserted that

the Restoration Period consists of the actual time period that would, or will, be required to restore Duane Reade's operations to the kind, quality, and level which existed at the WTC Store prior to the terrorist attacks and that such Restoration Period is coterminous with the time necessary to rebuild the complex which will replace the World Trade Center.

As an initial matter, the district court dismissed Duane Reade's breach of contract claim as premature and denied St. Paul's motion to either dismiss the action or compel appraisal in accordance with the policy. *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 261 F.Supp.2d 293 (S.D.N.Y.2003) ("*Duane Reade I*"). It then issued a declaratory judgment construing the policy's business interruption coverage. *Duane Reade II*, 279 F.Supp.2d at 235. The district court rejected as overly restrictive St. Paul's position that the "the period of restoration should last only so long as it would take Duane Reade to build a 'replacement' store somewhere in the vicinity of the former World Trade Center." *Id.* at 238 n. 4. In the district

court's view, "such an interpretation would ... be unreasonable, [because] it finds no support in the plain language of the Policy and ... it would render superfluous the other clauses requiring mitigation of damages." *Id.*

But the district court also rejected as "untenable" Duane Reade's expansive reading "that the Restoration Period must be coterminous with the time actually required to rebuild the entire complex that will replace the World Trade Center." *Id.* at 239. Instead, the district court held, the proper reading of the policy fell somewhere in between the parties' views, such that the Restoration Period was to be measured by the "hypothetical or constructive (as opposed to actual) time frame for rebuilding ... the WTC store itself, not the entire complex that once surrounded it," and that the Restoration Period would end "[o]nce Duane Reade could resume functionally equivalent operations in the location where its WTC store once stood." *Id.* (internal citation omitted).

Following a bench trial to resolve other issues and the entry of final judgment, St. Paul filed this appeal challenging the district court's declaration.

## DISCUSSION

St. Paul's primary contentions on appeal are that (1) the district court erred in tying the "hypothesized time" of the Restoration Period to the time required to rebuild Duane Reade's store "at the location where its WTC store stood"; and (2) the Restoration Period continues until Duane Reade resumes "functionally equivalent" operations. We agree and modify the district court's declaration accordingly.

St. Paul also argues that (3) the district court lacked jurisdiction over this declaratory judgment action; (4) Duane Reade's action was barred because it failed to submit a proof-of-loss statement or submit to

an appraisal; (5) the district court erred in denying St. Paul's motion to compel appraisal; (5) the district court's declaration was internally inconsistent because it tied the duration of the BI coverage to both the rebuilding of Duane Reade's store and Duane Reade's resumption of operations; and (6) Duane Reade's asserted BI losses are barred in any event because they result from the elimination of a consumer market in the area of the World Trade Center, a peril expressly excluded under the policy. Each of these arguments is meritless.

## I. *Standards of Review*

We review a district court's decision of whether to exercise jurisdiction over a declaratory judgment action deferentially, for abuse of discretion. *See Wilton v. Seven Falls Co.*, 515 U.S. 277, 289, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995); *see also Dow Jones & Co. v. Harrods Ltd.*, 346 F.3d 357, 359 (2d Cir.2003) (per curiam) (district courts have "a broad grant of discretion to ... refuse to exercise jurisdiction over a declaratory action that they would otherwise be empowered to hear"). Such abuse will be found only if the district court " 'bases its ruling on a mistaken application of the law or a clearly erroneous finding of fact.' " *United States v. Couto*, 311 F.3d 179, 185 (2d Cir.2002) (quoting *Milanese v. Rust–Oleum Corp.*, 244 F.3d 104, 110 (2d Cir.2001)). The standard for ripeness in a declaratory judgment action is that "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941).

The district court's decision on the merits of the parties' insurance dispute pres-

ents pure questions of law—construction of the St. Paul policy to determine the contractual rights and responsibilities of the parties—that we review *de novo*. *See Comm'l Union Ins. Co. v. Flagship. Marine Servs., Inc.*, 190 F.3d 26, 30 (2d Cir. 1999).

## II. *Case or Controversy*

As an initial matter, St. Paul asserts that the district court lacked jurisdiction to issue any ruling because there was no certainty that the case presented an actual "case or controversy." This argument is easily rejected.

The Declaratory Judgment Act, by its express terms, vests a district court with discretion to exercise jurisdiction over a declaratory action: "In a case of actual controversy within its jurisdiction ... any court of the United States ... *may* declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a) (emphasis added). In order to decide whether to entertain an action for declaratory judgment, we have instructed district courts to ask: (1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty. *See Broadview Chem. Corp. v. Loctite Corp.*, 417 F.2d 998, 1001 (2d Cir.1969).

St. Paul's jurisdictional challenge is based on its claim that the appraisal proceeding to which the parties must ultimately submit this dispute may show that any BI losses in excess of the sums already paid by St. Paul were offset by the migration of business from the WTC store to other Duane Reade stores in the area, even if the covered losses are found to extend until the WTC complex is rebuilt. The flaw in St. Paul's argument is that no

appraisal can occur until the legal parameters for valuating Duane Reade's losses have been set. It is well established that the scope of coverage provided by an insurance policy is a purely legal issue that cannot be determined by an appraisal, which is limited to factual disputes over the amount of loss for which an insurer is liable. *See, e.g., Indian Chef, Inc. v. Fire & Cas. Ins. Co.*, 2003 WL 329054, at *3 (S.D.N.Y. Feb. 13, 2003) ("A dispute between the parties that 'goes to coverage under the policy and can only be resolved by analysis and application of the policy' is not appropriate for appraisal.") (quoting *Kawa v. Nationwide Mut. Fire Ins. Co.*, 174 Misc.2d 407, 664 N.Y.S.2d 430, 431 (N.Y.Sup.Ct.1997)); *see also Zar Realty Mgmt. Corp. v. Allianz Ins. Co.*, No. 02 Civ. 6741, 2003 WL 1744288, at *4 (S.D.N.Y. Mar. 31, 2003).

Because the issue presented to the district court concerned the scope of coverage, the standard for ripeness, that "there is a substantial controversy ... between [the] parties," *Maryland Cas. Co.*, 312 U.S. at 273, 61 S.Ct. 510, was plainly satisfied. Indeed, as noted by the district court, St. Paul itself "concede[d] that there exists 'an actual and continuing controversy' between the parties" in its amended answer. *Duane Reade I*, 261 F.Supp.2d at 296. The district court, therefore, properly exercised jurisdiction over this case.

## III. *The No Action Clause*

St. Paul next contends that Duane Reade's action was barred by the policy's "No Action Clause" because Duane Reade failed to file a proof-of-loss statement and submit to an appraisal before filing its suit. In construing insurance policies, "words should be given the meanings ordinarily ascribed to them and absurd results should be avoided." *World Trade Ctr. Props., L.L.C. v. Hartford Fire*

*Ins. Co.*, 345 F.3d 154, 166 (2d Cir.2003) (internal quotation marks omitted). Whether a contract is ambiguous is a threshold question of law to be determined by the court. We have held that

> [a]n ambiguity exists where the terms of an insurance contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.

*Morgan Stanley Group Inc. v. New England Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000) (internal quotation marks omitted). Under New York law, moreover, a "policy must . . . be construed in favor of the insured, and ambiguities, if any, are to be resolved in the insured's favor and against the insurer." *U.S. Fid. & Guar. Co. v. Annunziata*, 67 N.Y.2d 229, 232, 501 N.Y.S.2d 790, 492 N.E.2d 1206 (1986). Employing these guiding principles, we conclude that the policy language does not support St. Paul's claims.

The No Action Clause of the policy before us provides:

> No suit or action on this policy for the recovery of any claim shall be sustainable in any court of law or equity unless [Duane Reade] shall have fully complied with all of the requirements of this policy. . . .

We find this language to be ambiguous with respect to the conditions for suit. While the clause may plausibly be read as precluding suit until Duane Reade satisfies every contractual obligation, as St. Paul asserts, it is equally amenable to being read as precluding suit only if Duane Reade has failed to satisfy those obligations that have accrued before the suit is filed. Because the latter reading is more favorable to Duane Reade, the insured, *id.*, we adopt it, and hold that the No Action Clause would bar Duane Reade's suit only if Duane Reade's obligation to file a proof-of-loss statement or to submit to an appraisal had accrued as of the date it filed this suit.

 The policy's proof-of-loss clause provides:

> In the event of loss covered by this policy, it shall be necessary for [Duane Reade] to render a proof of loss, signed and sworn to, stating the place, time, and cause of the loss, damage, or expense; the interest of [Duane Reade] and of all others; the value thereof; and the amount of loss, damage, or expense.

The clause does not specify a time period within which the proof of loss must be submitted. In addition, another policy clause, this one entitled "REPAIRS," provides:

> In case of loss, [Duane Reade] is hereby permitted to make immediately all necessary repairs or replacement. Due notice of such loss, when it appear[s] that the amount thereof will exceed the amount of the initial net loss provided herein, shall be given to [St. Paul] without delay; however, *[Duane Reade] shall not be required to render proof of loss until such loss has been repaired or replaced at which time proof of loss and statements shall be rendered for settlements.*

(emphasis added). Because Duane Reade had not yet rebuilt or replaced its WTC store as of the date suit was filed, its obligation to file a proof-of-loss statement had not yet accrued pursuant to the Repairs clause. This conclusion finds further support in a clause entitled "Partial Payment," which provides:

> In the event of a loss occurring which has been ascertained to be a valid claim

under this policy and estimated by [St. Paul]'s representatives to be in excess of the deductible, *[St. Paul] hereon agrees on the submission of a partial proof of loss to advance to [Duane Reade] a mutually agreed upon amount of the estimated loss prior to production of final proof.*

As St. Paul asserted in its brief, it paid Duane Reade $9.8 million for Duane Reade's BI losses before this lawsuit was filed, even though Duane Reade had not yet submitted a proof-of-loss statement. In fact, St. Paul did not demand a proof-of-loss statement until February 4, 2003, the day after it filed its answer to Duane Reade's complaint and more than five months after this action began. Duane Reade subsequently complied with that demand, which St. Paul has acknowledged. *See Duane Reade II,* 279 F.Supp.2d at 236 n. 1. When the foregoing policy terms and St. Paul's actions are considered together, it becomes clear that Duane Reade was not yet obligated to file a proof-of-loss statement when it filed suit.

St. Paul's related argument that an appraisal was required before suit could be brought is similarly unavailing. The policy's appraisal clause provides:

> If [Duane Reade] and [St. Paul] fail to agree on the amount of loss, each, *upon the written demand either of [Duane Reade] or of [St. Paul]* made within 60 days after receipt of proof of loss by [St. Paul], shall select a competent and disinterested appraiser....

Joint App. at 1324 (emphasis added). Under the plain language of this provision, neither party was required to submit to an appraisal unless and until Duane Reade

had filed a proof of loss and either party had issued a written demand for appraisal. Although St. Paul demanded an appraisal in the same letter in which it first demanded a proof of loss, this demand had no effect on the viability of Duane Reade's suit filed five months earlier. *Cf. Lynch v. Am. Family Mut. Ins. Co.,* 163 Wis.2d 1003, 473 N.W.2d 515 (Ct.App.1991) (while proper demand for appraisal prior to commencement of action transforms appraisal into condition precedent to lawsuit, post-lawsuit demand for appraisal does not stop litigation unless policy specifically makes appraisal precondition to suit). Moreover, in its demand, St. Paul stated that the issues it sought to have submitted to appraisal were "independent of any questions regarding ... the appropriate period of restoration, the delay and market loss exclusion as well as other coverage issues," and that it was "leaving for the Court coverage questions such as the appropriate period of restoration." It is apparent from the foregoing that, in this case at least, it was the lawsuit that had to precede the appraisal, not the other way around.

In sum, we hold that Duane Reade satisfied all of the policy's requirements for filing suit and, therefore, that the district court did not err in denying St. Paul's motion to either dismiss or compel appraisal.

## IV. *The Period of Restoration*

With the underbrush thus cleared, we turn to the subject of the principle dispute on this appeal: the district court's declaration of the scope of Duane Reade's BI coverage,[1] which it determined primarily

1. The policy's business interruption clause provides coverage for:

> The interest of [Duane Reade] in loss of earning (business interruption), including ordinary payroll, continuing expenses, loss

of royalties and bonus programs as a result of an interruption of [Duane Reade]'s business (either partial or total) if such interruption is a result of a peril, not excluded under this policy, causing direct physical

by construing the policy's Restoration Period clause. The district court held, in relevant part,

> On their face, the Restoration Period clauses envision a hypothetical or constructive (as opposed to actual) time frame for rebuilding, as evidenced, for example, by their use of the subjunctive "would." Moreover, what is to be hypothesized is the time it would take to rebuild, repair, or replace the WTC store itself, not the entire complex that once surrounded it. Once Duane Reade could resume functionally equivalent operations in the location where its WTC store once stood, the [Restoration Period] would be at an end. Any losses continuing beyond that point would be addressed by the "Extended Recovery Period" provision in the Policy, not by the [Restoration Period] clause.

*Duane Reade II*, 279 F.Supp.2d at 239 (internal citations omitted). St. Paul argues that the district court erred by (1) extending the Restoration Period to when

Duane Reade resumes operations that are "functionally equivalent" to its pre–9/11 operations; and (2) declaring that the length of the Restoration Period is tied to rebuilding a store at the specific WTC site where Duane Reade's store was located.[2] We discuss each of these issues in turn.

### A. *"Functionally Equivalent Operations"*

St. Paul contends that the district court's declaration that the Restoration Period ends at the point Duane Reade "could resume functionally equivalent operations" effectively rewrites the policy by superseding and enlarging upon the more limited coverage provided by the policy's Extended Recovery Period clause. We agree.[3]

■ The Restoration Period clause establishes that BI coverage lasts only for the reasonable amount of time it would take Duane Reade "exercis[ing] ... due diligence and dispatch to rebuild, repair, or replace such property that has been de-

---

loss or damage to any Real or Personal Property whether insured or not ... including but not limited to loss or damage to ... property of [Duane Reade], ... and property of customers ....

**2.** St. Paul also argues, albeit unpersuasively, that the standard set forth by the district court is incapable of being implemented because it is internally inconsistent. The gist of this claim seems to be that the district court's standard combines incompatible components—the physical act of rebuilding Duane Reade's WTC store and the intangible act of resuming operations—to measure the Restoration Period. This argument makes little sense. The coverage at issue is for business interruption, not property damage. Logically, coverage under the Restoration Period must continue for at least the reasonable time necessary to end the interruption, which—at least in this case—necessarily involves more than just "rebuild[ing], repair[ing], or replac[ing]" the relevant real property. If coverage terminated at the conclusion of physical

reconstruction, Duane Reade would not be indemnified for the time necessary to prepare for reopening. *See e.g., Anchor Toy Corp. v. Am. Eagle Fire Ins.*, 4 Misc.2d 364, 155 N.Y.S.2d 600, 603 (1956) (calculating separate period of time after completion of rebuilding for plaintiff to prepare for resumption of operations).

**3.** It is possible that the district court's use of the phrase "functionally equivalent operations" was just an inadvertent transposition of the wording contained in a prior letter ruling issued by the district court, which held that the Restoration Period would continue until Duane Reade could build "the *functional equivalent* of the WTC premises Duane Reade occupied," and that the Restoration Period would ultimately terminate "once Duane Reade could resume operations in the location where its WTC store once stood." Letter Ruling dated July 8, 2003, at 2 (internal citation omitted). There would seem to be little daylight between this letter ruling and St. Paul's position on this issue.

stroyed or damaged." Courts have consistently construed this or similar language as entitling the insured to continue to recover its lost profits until it can build a reasonably equivalent store in a reasonably equivalent location. *See, e.g.,* Lee R. Russ, 12 *Couch on Insurance* §§ 183:55, 185:7 (3d ed. 1998 & Supp.2003); *Beautytuft, Inc. v. Factory Ins. Ass'n,* 431 F.2d 1122, 1128 (6th Cir.1970) (holding that insured's resumption of partial operations in inferior, temporary premises did not terminate business interruption coverage); *see also Anchor Toy Corp. v. Am. Eagle Fire Ins. Co.,* 4 Misc.2d 364, 155 N.Y.S.2d 600, 603 (N.Y.Sup.Ct.1956) (holding that insured was entitled to modernize premises upon rebuilding). The rationale behind such holdings has generally been that insureds would lack any incentive to resume partial operations in temporary locations or under other inferior circumstances in order to mitigate damages if such actions would terminate their BI coverage. *See Couch on Insurance* §§ 183:55, 185:7. By contrast, we have found no case ruling that an insured is entitled to BI coverage until it can resume "functionally equivalent operations."

The fact that the district court incorporated novel terminology in order to determine the scope of coverage under such unusual circumstances is not, in and of itself, what proves fatal. Rather, it is that the novel terminology the district court chose conflicts with the coverage provided by the Extended Recovery Period clause, which provides:

> This policy is extended to cover the Actual Loss Sustained by [Duane Reade] resulting from interruption of business for such additional length of time as would be required with the exercise of

due diligence and dispatch to restore [Duane Reade]'s business to the condition that would have existed had no loss occurred, commencing with the [later] of the following dates:

> a) the date on which liability of [St. Paul] of loss resulting from interruption of business would terminate if the [Extended Recovery Period] clause had not been attached to this policy or
>
> b) the date on which repair, replacement, or rebuilding of such part of the property as has been damaged is actually replaced, but in no event for more than twelve months from said later commencement date.

The purpose of the Extended Recovery Period is to provide additional coverage for the likely event that Duane Reade will continue to suffer losses due to its business interruption after it reopens the WTC store. The Extended Recovery Period guarantees Duane Reade its pre–9/11 profits until the earlier of when Duane Reade can restore business at its WTC store to the condition it would have been in had the WTC not been destroyed or twelve months after the Restoration Period ends.[4]

Although the district court plainly recognized the relationship between the Restoration Period and the Extended Recovery Period, *see Duane Reade II,* 279 F.Supp.2d at 239 ("Any losses continuing beyond th[e] point [that Duane Reade could resume functionally equivalent operations] would be addressed by the 'Extended Recovery Period' provision in the Policy, not by the Restoration Period clause.") (internal citation omitted), its use of "functionally equivalent" to enhance the level of operations that will terminate the Restoration Period leaves no room for the

---

4. As we noted earlier, the $9.8 million that St. Paul paid Duane Reade when it first settled Duane Reade's claim included 12 months of full profits pursuant to the Extended Recovery Period.

Extended Recovery Period to operate. If Duane Reade achieves functionally equivalent operations within twelve months of resuming operations, the Restoration Period will terminate, but the Extended Recovery Period will not be triggered because Duane Reade will already have met the criteria for terminating that coverage. More important, if Duane Reade requires more than twelve months to achieve functionally equivalent operations, it will continue to receive business interruption coverage after the Extended Recovery Period coverage expires. As a result, the district court not only rendered the Extended Recovery Period provision superfluous, it nullified the express time constraints the parties agreed to place on such recovery, thereby effectively rewriting the policy to increase Duane Reade's coverage.

Because the district court's interpretation of the Restoration Period cannot be reconciled with the policy's other provisions, particularly the Extended Recovery Period, it must be modified to eliminate "functionally equivalent" to define the type of operations that will terminate the Restoration Period.

### B. *Tying Restoration to the Site of the WTC Store*

The district court held that the Restoration Period was necessarily tied to a hypothesized rebuilding of Duane Reade's store at its former site at the WTC. Both parties construe this ruling as extending the Restoration Period to include, at a minimum, the time it would take to build the WTC building in which Duane Reade's store would be located. We need not decide whether this interpretation is correct because, in any event, we conclude that the district court erred in tying the Restoration Period to the specific site of Duane Reade's former store at the WTC.

Duane Reade defends the district court's site-specific reading of the Restoration Period by asserting that the parties intended to protect Duane Reade's interest in the specific location of its valuable WTC store. As evidence of this intent, Duane Reade points to the BI clause's coverage for damage to "Real or Personal Property whether insured or not, including ... property of others." Duane Reade characterizes this language as creating "Contingent Business Interruption" coverage that reimburses Duane Reade for BI losses that are caused by damage to property that is not owned by Duane Reade but upon which its business depends, *i.e.*, the WTC building in which Duane Reade's store was located. Duane Reade also relies on a policy provision entitled "Attraction Properties," which provides:

> This policy is extended to cover the Actual Loss Sustained by [Duane Reade] directly resulting from the interruption of [Duane Reade]'s operation caused by damage to or destruction of Real or Personal property at Attraction Properties.
>
> Attraction Properties are defined as properties within on[e] statute mile of [Duane Reade]'s location, not operated by [Duane Reade], which attract potential customers to [Duane Reade]'s location.

Duane Reade contends that the inclusion in the policy of these two coverages establishes site-specific coverage for BI losses Duane Reade suffers as a result of damage to property owned by third parties. We disagree with Duane Reade's reasoning.

Even if we assume that the St. Paul policy provides coverage for business interruption losses caused by damage to properties owned by others but upon which Duane Reade's business depends, Duane Reade did not file a claim for losses under either of these coverages following

the destruction of the WTC. In addition, neither coverage alters or affects the critical language of the Restoration Period setting forth the mechanism for determining the duration of coverage. We conclude, therefore, that neither of these two coverages has any bearing on this case.

The primary flaw in Duane Reade's claim that the parties specifically intended to provide BI coverage until Duane Reade could resume operations at the site of its former WTC store, however, is that the St. Paul policy is a general one covering all 200 Duane Reade stores. It makes no reference to the WTC store or, for that matter, *any* specific property other than Duane Reade's main headquarters, which is listed on the policy's declarations page. This omission distinguishes this case from those cases, relied upon by Duane Reade, in which the court tied the length of business interruption coverage to the rebuilding and/or replacing of the specific property that was the subject of the insurance policy.

The BI clauses at issue in those cases specifically referred to the subject property, which typically was identified by address. For example, *Anchor Toy Corp.*, a case relied upon by the district court, involved the destruction of a toy manufacturer's factory. The policy's BI clause provided coverage " 'if the building . . . situate[d at] 784 Main Street, Coudersport, Potter County, Pa. . . . be destroyed . . . by [a covered] peril[ ] . . . so as to necessitate a total or partial suspension of business.' " 155 N.Y.S.2d at 602. In turn, the policy's valuation provision (*i.e.*, restoration period) provided coverage " 'not exceeding such length of time as would be required with the exercise of due diligence and dispatch to rebuild, repair or replace such part of the *above described property* as has been destroyed or damaged.' " *Id.* at 603 (emphasis added); *see also Omaha*

*Paper Stock Co. v. Harbor Ins. Co.*, 596 F.2d 283, 285 (8th Cir.1979) (policy tied length of restoration to " 'time . . . it would take . . . to repair and/or replace the *property herein described,*' " referring to the property identified in the declarations page as " 'the premises . . . situated at 1401 Laird Street' ") (emphasis added); *Beautytuft, Inc.*, 431 F.2d at 1123 (policy tied restoration period to theoretical time to rebuild " 'described property' "); *Steel Prods. Co. v. Millers Nat. Ins. Co.*, 209 N.W.2d 32, 33–34 (Iowa 1973) (policy tied restoration period to rebuilding " 'the property herein described' "); *Hawkinson Tread Tire Serv. Co. v. Ind. Lumbermens Mut. Ins. Co.*, 362 Mo. 823, 245 S.W.2d 24, 25–26 (1951) (policy tied restoration period to rebuilding of " 'the described building, and machinery and equipment contained therein, situated at 1119–23 North Twelfth Street' ").

By contrast, the physical premises of the WTC building in which Duane Reade's store was located was not the subject of the St. Paul policy. Nor was the WTC even mentioned by name, as might be expected had the parties intended to single out the WTC store in a policy that covered all of Duane Reade's 200 stores. Instead, the declarations page lists only Duane Reade's corporate address, and no specific property is referred to in the BI clause, which omits even generic terms for location, such as "premises," "site," or "building." Thus nothing in the BI clause supports Duane Reade's claim that it provides site-specific coverage for its WTC store.

Our interpretation of the Restoration Period is consistent with the only case we have found that addresses the length of a restoration period in the context of leased premises that are contained within a larger building, *Streamline Capital, L.L.C. v. Hartford Casualty Insurance Co.*, No. 02 CIV. 8123(NRB), 2003 WL 22004888

(S.D.N.Y. Aug 25, 2003). In *Streamline*, offices that the insured, a computer facilities management company, had leased in the WTC were destroyed on 9/11. Judge Buchwald rejected the insured's argument that the restoration period for its BI coverage extended until the WTC was rebuilt. Distinguishing cases like *Anchor Toy,* the district court held,

> Given that "premises" in the phrase "property at the described premises" [in the policy's restoration period clause] means plaintiff's office suite, the only reasonable construction of the word "property" [in that same phrase] is [that it means] the plaintiff's own personal property—computers, desks, chairs, etc. This interpretation is logical, given that the Policy's Business Income coverage states: "We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your 'operations' during the 'period of restoration.'" That the business income coverage only applies to the suspension of the plaintiff's "operations" indicates that it is dependent only on replacing what is necessary to resume those operations— namely, the plaintiff's personal property, not a specific office at a specific location.

*Id.* at *9.

We agree with Judge Buchwald's reasoning and find it equally applicable to the present case. As in *Streamline,* the St. Paul policy says nothing about the specific location of the interrupted business. It simply provides coverage until Duane Reade can "repair, rebuild, or replace" the property that was damaged and resume operations. Also in line with *Streamline,* the damaged property is the property Duane Reade had located in the premises it leased from the WTC.

Doubtless, if awaiting the rebuilding of the WTC and moving Duane Reade's WTC store to a new location were roughly equivalent tasks, the BI coverage would extend to whichever task Duane Reade, in its discretion, chose to do. The rebuilding of the WTC, however, will be a herculean undertaking far exceeding the rebuilding of a Duane Reade store in an existing building, or even in an as-yet-to-be built Manhattan office building, and involving numerous and complex contingencies over which neither Duane Reade nor St. Paul has any control. Under these circumstances, it would be entirely unreasonable to interpret the Restoration Period to include the time it would take for Duane Reade to resume operations in a store located at its former site where that site was neither the subject of the insurance policy nor expressly provided for in the calculus set forth in the Restoration Period. *See Streamline,* 2003 WL 22004888, at *9–*10 ("It is wholly unreasonable to think that the period of restoration should be tied to the rebuilding of real property over which neither the insured nor the insurer had any control, instead of tying it to a process that the plaintiff controlled: the acquisition of replacement office space and the installation of the plaintiff's personal property in that space."); *Roundabout Theatre Co.,* 751 N.Y.S.2d at 7–8 (rejecting plaintiff's claim that the Restoration Period extended until damage that occurred on the street and prevented access to theater was repaired because "the insured obviously has no duty to repair a third party's property"); *Anchor Toy,* 155 N.Y.S.2d at 603 (holding that while insured was entitled to modernize its new building, "[d]oubtless if an extraordinary additional time would be required to include improvements or innovations these would not be included."); *see also Cong. Bar & Res., Inc. v. Transamerica Ins. Co.,* 42 Wis.2d 56, 165 N.W.2d 409 (1969) (holding that restoration beyond what is reasonably necessary to restore the premises to its previous condition, such as demolition or recon-

struction, are irrelevant and cannot be used to extend the period of compensation). In light of the foregoing, we conclude that the district court erred in holding that the St. Paul policy indemnifies Duane Reade for BI losses until the interrupted business can be resumed at the same location.

We find further support for this conclusion in the fact that the policy does, in fact, address the kind of site-specific losses Duane Reade seeks under the BI coverage in its provisions for the real-property coverage entitled "Leasehold Interest."[5] The Leasehold Interest coverage substantiates Duane Reade's contention that the parties intended to protect Duane Reade's profit-generating store locations. As we explain, however, the precise coverage provided by the Leasehold Interest clause is decidedly different than the one Duane Reade seeks under the policy's BI clause.

Under the Leasehold Interest clause, coverage is extended for the "Actual Loss Sustained" in the event that a lease is terminated due to necessary untenantability arising from destruction of leased premises by a covered peril. That is precisely the circumstance here. Although some leases require the landlord to rebuild the leased premises if they are destroyed, *see, e.g., Hotel des Artistes, Inc. v. Gen. Acc. Ins. Co.,* 9 A.D.3d 181, 775 N.Y.S.2d 262, 264 (App. Div. 1st Dep't 2004) (duty-to-defend case where underlying suit brought by lessee against landlord for breach of duty to repair that caused denial of lessee's business interruption claim), Duane Reade's lease for the WTC store did not. Instead, it gave Duane Reade's landlord, the Port Authority of New York and New Jersey ("Port Authority"), discretion to either rebuild destroyed property or terminate the lease if the necessary repairs would take more than 90 days to complete. At oral argument, the parties informed us that the Port Authority chose the latter option and terminated Duane Reade's lease shortly after 9/11 on the grounds of necessary untenantability. Under the valuation provision of the Leasehold Interest clause,[6] the cancellation of the WTC leasehold entitled Duane Reade to reimbursement for the loss of the WTC site's actual rental value (*i.e.,* its intrinsic value) less the rents and expenses Duane Reade would have had to pay, *but only* until the lease would have expired of its own accord.

That it is the Leasehold Interest clause, and not the BI clause, that protects Duane Reade's interest in the WTC site is also a matter of common sense. A leasehold is a property interest; its cancellation deprives the owner of the right to inhabit or make use of that particular location, with all its attendant benefits. When such cancellation also interrupts a business, the losses caused specifically by the interruption will end shortly after the business resumes, whether at the original site or a new one. A company may, however, experience additional losses that are caused, not by the

---

**5.** Coverage D of the policy, entitled "Leasehold Interest," provides coverage for

> The ACTUAL LOSS SUSTAINED by [Duane Reade] resulting from necessary untenantability due to the cancellation of a lease by any party other than [Duane Reade] ... when such untenantability results from direct physical loss or damage to or destruction of leased premises, by the perils insured against.

**6.** The valuation provision related to the Leasehold Interest clause explains that the "actual loss" will be

> computed as ... [t]he excess of Actual Rental Value of the premises over the Actual Rental Payable ... by [Duane Reade], during the unexpired term of the lease, whether the premises are occupied in whole or in part by [Duane Reade] or whether the premises are sub-let to other tenants.

interruption, but by the relocation of a business and the concurrent loss of benefits of the original site, such as increased foot traffic, entrenched customer base, or superior location. While this is the type of loss that was targeted by Duane Reade's demand for BI coverage until the entire WTC complex is reopened, and was partially accommodated by the district court's declaration, the BI clause does not address such loss. Rather, it is addressed exclusively by the Leasehold Interest clause.

In sum, we hold that the St. Paul policy does not provide BI coverage until Duane Reade can resume operations in a store located at its former WTC site. Instead, coverage extends only for the hypothetical time it would reasonably take Duane Reade to "repair, rebuild, or replace" its WTC store at a suitable location. To be sure, there are few if any locations in New York City comparable to the WTC, and Duane Reade will most likely not be able to recreate the profit stream it once enjoyed there. But any discrepancies between the new building and the WTC in terms of benefits and advantages are exclusively accounted for under the Leasehold Interest clause.

We therefore modify the district court's construction of the Restoration Period in order to effectuate the policy's separate treatment of loss due to business interruption and losses due to the cancellation of a leasehold. To that end, we eliminate the district court's restriction of location, *i.e.*, rebuilding the WTC store at its former site, as well as its emphasis on "rebuilding," despite the BI clause's broader reference to "repair[ing], rebuild[ing], or re-plac[ing]," which together impermissibly extended Duane Reade's BI coverage to include injury caused by Duane Reade's loss of the WTC leasehold.

## IV. *The "Loss of Market" Exclusion*

Finally, St. Paul renews the argument it made in the district court that Duane Reade's losses are excluded under the policy because they would have occurred in any event as a result of the disappearance of the local consumer market that ensued from the destruction of the WTC. The provision relied on by St. Paul excludes "loss or damage caused by ... delay or loss of market."

The district court held that St. Paul had "foregone" the issue because it had expressly acknowledged that Duane Reade had suffered both property loss and BI losses as a result of the destruction of its store in the WTC as a result of a covered peril. *Duane Reade II*, 279 F.Supp.2d at 239–40. If, by the term "foregone," the district court meant that St. Paul had "waived" its right to claim an exclusion, the basis for the district court's holding is not apparent from the record. But we need not resolve this issue because the district court's rejection of St. Paul's argument can be affirmed on another basis. *See Boy Scouts of Am. v. Wyman*, 335 F.3d 80, 90 (2d Cir.2003) (court of appeals may affirm on any ground supported by the record).

Put simply, whether Duane Reade's BI losses can be attributed in whole or in part to a loss of market in the WTC vicinity has no bearing in this case. In filing for a declaratory judgment, Duane Reade presented the district court with a purely legal question concerning the scope of coverage provided by the St. Paul policy for BI losses. As the district court noted, St. Paul has already acknowledged that Duane Reade has suffered a loss due to BI and has paid Duane Reade some $9.8 million for these losses. Because there is no dispute that Duane Reade suffered a BI loss, St. Paul's assertion that the "loss of market" exclusion applies to Duane Reade's

claim creates, at most, a factual issue concerning the amount of loss Duane Reade may recover. Such factual issues are properly the subject of the appraisal proceeding.

## CONCLUSION

For the foregoing reasons, we modify the district court's declaration to read as follows:

> On their face, the Restoration Period clauses envision a hypothetical or constructive (as opposed to actual) time frame for rebuilding, *repairing, or replacing,* as evidenced, for example, by their use of the subjunctive "would." Moreover, what is to be hypothesized is the time it would take to rebuild, repair, or replace the *functional equivalent of the store Duane Reade lost,* not the *WTC* complex that once surrounded it. Once Duane Reade could resume operations in *a permanent location reasonably equivalent to the site of its former store at the WTC,* the Restoration Period would be at an end. Any losses continuing beyond that point would be addressed by the "Extended Recovery Period" provision in the Policy, not by the Restoration Period clause.

(Modifications italicized).

The judgment of the district court as modified by this opinion is AFFIRMED.