In re COSMETICS PLUS GROUP, LTD., et. al., Debtors.

Cosmetics Plus Group, Ltd. and Cosmetics Plus South Ltd.,

v.

American International Group, Inc. & New Hampshire Insurance Company, Defendants.

Bankruptcy No. 01–14471 (PCB).
Adversary No. 03–8032 (PCB).

United States Bankruptcy Court, S.D. New York.

Oct. 24, 2007.

Howard M. File, Esq., Staten Island, NY, for Plaintiffs.

White Fleischner & Fino, LLP, by Nicholas L. Paone, Esq., New York, NY, for Defendants.

*MEMORANDUM DECISION PARTIALLY GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING CROSS–MOTION*

PRUDENCE CARTER BEATTY, Bankruptcy Judge.

American International Group, Inc. and New Hampshire Insurance Company (the "Defendants") have moved for partial summary judgment with respect to Count II of the amended complaint. That count seeks recovery in the total amount of $1,699,357 under the business interruption provisions of the insurance policy issued by the Defendants in favor of the plaintiffs.

The plaintiffs have filed a cross-motion related to issues raised by the motion for partial summary judgment.

Based on the findings of facts and conclusions of law that follow, the Court partially grants the motion for summary judgment on Count II and denies the cross-motion.[1]

---

[1] The cross-motion for summary judgment also deals with two additional counts of the amended complaint, Count III (Violation of Deceptive Business Practices Act, Section 349 of New York General Business Law) and Count IV (Consequential Damages for Breach of Insurance Agreement). While these counts have little significance in light of the Court's disposition of the Defendant's motion for summary judgment, the Court exercises its discretion not to dismiss these counts at this time since the parties have not directly addressed them and they may have some rele-

## FACTUAL BACKGROUND

The plaintiffs, two of a 22–debtor retail chain, filed chapter 11 petitions on August 10, 2001 (collectively, all of the debtors that filed chapter 11 petitions will be referred to herein as the "Debtors" or "Cosmetics Plus").[2] Cosmetics Plus had been in business for approximately 30 years and sold cosmetics, perfumes and related items. The vast majority of the stores were located in mid-town Manhattan, although the two stores that are the subject of this decision were located downtown: one at 170 Broadway and the other in the concourse at 1 World Trade Center.[3]

For at least several weeks prior to the chapter 11 filings, Toby Bartosh and her husband Robin Bartosh, the principal shareholders of Cosmetics Plus (the "Principals"), had been negotiating with their lender, who was, by far, the largest creditor as well as their other creditors in an attempt to stave off liquidation of the Debtors, which had experienced substantial operating losses. The Principals, however, had been unable to find an investor with a proposal satisfactory to creditors.

On the filing date, the Debtors filed an application seeking authority to conduct an auction of their assets or, in the alternative, for approval of an agreement with Hilco Merchant Resources, LLC ("Hilco") to act as the Debtors' agent and to conduct going-out-of-business sales at all of the Debtors' stores (the "Hilco Agreement").

Thereafter an auction was held but no acceptable bid was received.

On August 30, 2001, the Court held a hearing at which it approved the Hilco Agreement and authorized the going-out-of-business ("GOB") sales. The Hilco Agreement detailed the price to be paid to the Debtors by Hilco for all of the Debtors' inventory in their stores as well as for the inventory located in their Long Island City warehouse. Under the Hilco Agreement, Hilco was permitted to shift merchandise among the Debtors' stores. Hilco was also permitted to supply the stores with merchandise from the Debtors' Long Island City warehouse. Hilco was *not* permitted, however, to supplement or augment the Debtors' inventory from any other source.[4] The Hilco Agreement contained numerous provisions relative to the allocation of expenses, the payment of employees and the like.

The Hilco Agreement further provided that the GOB sales would end no later than December 24, 2001, although Hilco had the right to close stores of its choosing earlier than that date. After December 24, 2001, Hilco was required to promptly surrender all premises, broom-clean. The Hilco Agreement required Hilco to liquidate any inventory remaining after December 24th and provided a distribution mechanism for those sale proceeds as between the Debtors and Hilco. At the Au-

---

vance to the counts which are not the subject of this opinion.

2. For reasons irrelevant to this decision the other cases have all since been dismissed. *See* Case Document No. 383.

3. There were some stores that were located elsewhere in the United States.

4. In some situations, liquidators are allowed to add stock of their own to the merchant's stock. That was not permitted in this case. In the Hilco Agreement, the price the Debtors were to receive for the actual inventory had been set at a fixed percentage. Based on the physical inventory taken by Hilco at the stores and the warehouse the total amount of the Debtors' aggregate inventory available for sale was determined. There was an upside potential for the Debtors in the event the GOB sales went better than expected, but Hilco bore the economic risk that the guaranteed price it was paying for the inventory was too high if the sales did not go as well as expected.

gust 30 hearing, the Court also authorized the Debtors to proceed with assigning or rejecting their leases since it was the Debtors' stated intention to market their leaseholds to secure additional recoveries for the benefit of creditors.

Hilco promptly undertook the necessary preparations for the GOB sales. The most significant matter was probably the taking of the complete inventory at all the stores, including 170 Broadway and 1 World Trade Center, and at the warehouse. The inventory was completed in less than a week and the GOB sales, which commenced at all of the stores on Labor Day Weekend, had been underway for several days when the World Trade Center was destroyed by terrorists on September 11, 2001. The damage caused by the terrorist attacks shut down the GOB sales at the 1 World Trade Center store and at the nearby 170 Broadway store.

The Debtors' store located on the concourse at 1 World Trade Center was a total loss. The Defendants have already paid the full retail value of the inventory located at that store as well as the agreed value of the furnishings, fixtures and equipment. Prior to the September 11th attacks, the Debtors had anticipated being able to assume and assign the World Trade Center lease, since it was viewed as one of the Debtors' more valuable leases. Due to the destruction and subsequent total demolition of the World Trade Center, the Debtors were unable to realize anything from the leasehold itself. It is undisputed that the Debtors had no insurance covering the leasehold.

The store at 170 Broadway was located on a corner a few blocks away from the World Trade Center. At some point on September 11th or early September 12th, a large flying object broke the plate glass window of the 170 Broadway store. As a result, substantial ash and debris blew into the store and the store was rendered totally inoperable. The Defendants have fully satisfied the insurance claim for the retail value of the inventory located at this store.[5] The Debtors ultimately rejected the lease for 170 Broadway. *See* Order dated August 30, 2001, Case Doc. No. 85.

Even though the approval and implementation of the Hilco Agreement had functionally put an end to the business of the Debtors, the principals of the Debtors seem to have believed that the Cosmetics Plus name could somehow continue. Apparently the Principals were not planning a reorganization of the *Debtors,* but rather were planning to establish a new enterprise using some of the Debtors' leases but none of its inventory. At her deposition, Toby Bartosh conceded that any prospects for obtaining an outside investor ended in the wake of the impact of September 11th on the economic environment of New York City. She stated that after September 11th the party with whom they were negotiating backed out because "there was no climate for any business growth whatsoever * * * [t]he World Trade Center was blown up and the whole city was paralyzed for quite some time, and I believe has not fully recovered." *See* Deposition of Toby Bartosh, July 14, 2003 at 26.

On February 5, 2003, the Debtors commenced this adversary proceeding. They assert claims for business interruption losses in connection with the 1 World Trade Center and 170 Broadway stores.

---

**5.** There is a dispute, which is unresolved, over whether the furnishings, fixtures and equipment at 170 Broadway should be considered a total loss, as the Debtors claim, or could have been cleaned and/or refurbished, as the Defendants claim. However, this dispute is the subject of Count I of the amended complaint and is not the subject of the Defendants' motion for partial summary judgment or the Debtors' cross-motion.

More particularly, in Count II of the amended complaint, the Debtors' allege that their business interruption insurance coverage entitles them to insurance proceeds for lost profits in the amount of $1,699,357.[6] This amount is based on projections made by Price Waterhouse Coopers LLP, the Debtors' consulting accountants, of future income at the two stores over a period of two years after September 11, 2001. The projections are erroneous, *inter alia*, because the policy had a one-year limit on business interruption losses.

The Defendants issued insurance policy 01–LX–6342711 (the "Policy") to the Debtors on February 15, 2001, which covers the period at issue. The Policy lists all of the Debtors' stores as well as its warehouse. The relevant portions of the Policy provide that the amount of the covered loss for business income will be determined based on the "[n]et [i]ncome of the business before the direct physical loss or damage occurred" as well as "the likely [n]et [i]ncome of the business if no physical loss or damage had occurred * * *." The Policy further provides for payment for the actual loss of business income sustained due to the "necessary suspension" of business operations during the period of restoration plus a 30–day period to "ramp up" the business to its level of earnings right before the damage occurred. The suspension "must be caused by direct physical loss of or damage to [insured] property * * *." The period of restoration is defined as "ending on the earlier of 1) the date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or 2) the date when business is resumed at a new permanent location."

The Policy also contained Endorsement Package CP100300695 that similarly provided for business income and also included extra expense coverage. In the Endorsement Package, business income is defined as net income that would have been earned plus continuing normal operating expenses. Extra expenses include "any extra expense to avoid or minimize the suspension of the business and to continue operations at either the described premises or at any replacement or temporary location."

The Defendants do not dispute that the Policy contains a provision for business interruption coverage. Nor have they, despite the Debtors' suggestions to the contrary, refused business interruption coverage on the grounds that the destruction of the World Trade Center Towers or the damage at 170 Broadway was due to terrorism. Rather it is the position of the Defendants that the Debtors' business, in its entirety, had failed *before* the events of September 11 and the Defendants have shown no compensable loss of business income. The Defendants have moved for partial summary judgment on the grounds that coverage under the Policy would only exist for prospective lost profits, which in their view do not exist.

Having already reimbursed the Debtors for one "rollover" of inventory by paying the full retail price of the inventory located

---

**6.** The breakdown for the Debtors projected loss of business income was $736,643 for the 170 Broadway store and $962,714 for the 1 World Trade Center store. *See* Summary of Business Loss prepared by PriceWaterhouseCoopersLLP dated as of July 30, 2002, Exhibit A to Declaration of Howard M. File in Support of Debtors Cross–Motion for Partial Summary Judgment Motion dated September 29, 2004; Debtors Statement of Loss prepared by Daynard & Van Thunen Co., Inc. dated as of October 9, 2002, Exhibit H to Defendants Memorandum of Law in Support of Motion for Partial Summary Judgment dated July 2, 2004.

at each store, the Defendants assert that they have already compensated the Debtors for any business interruption losses at 1 World Trade Center and 170 Broadway. The deposition testimony of the Principals reflect that in the Debtors' best days, one rollover of inventory represented approximately three months of sales at 170 Broadway and about two and a half months at 1 World Trade Center. Given that the Debtors were liquidating their inventory at the time of the loss and that all of their stores would be closed on or before December 24, 2001, the Defendants urge that their payment for the retail value of the inventory for the two stores fully covered any profits that could have been earned in the GOB sales.

In their response to the motion for partial summary judgment, the Debtors do little more than argue that the motion should be denied because they are entitled to the $1,699,357 set forth in their proof of loss. The Debtors urge that because the Policy provides for business interruption coverage and they paid a premium for that coverage they therefore must necessarily have a business interruption claim since it is undeniable that the events of September 11th rendered the two stores unusable, one permanently and one temporarily. The Debtors have also asserted that under the terms of the Policy the period of restoration for 1 World Trade Center is until "at least 30 days after the World Trade Center is rebuilt" and that they are entitled to business interruption insurance until that time.

The Debtors have not offered any analysis of projected inventory sales based on the Hilco Agreement that would demonstrate any actual economic loss due to the earlier than expected closure date for the two stores which was not already compensated for by the Defendants' payment for the destroyed inventory.

## DISCUSSION

### *Summary Judgment*

Federal Rule of Civil Procedure 56, as made applicable to adversary proceedings by Bankruptcy Rule 7056, provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265. (1986). A fact is material only if it affects the result of the proceeding and a fact is in dispute only when the opposing party submits evidence such that a trial would be required to resolve the differences. *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975), *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976); *In re Rockefeller Center Properties*, 272 B.R. 524, 540 (Bankr.S.D.N.Y.2000). The court's function when faced with a motion for summary judgment is to determine whether there exist any genuine issues of a material fact to be tried, and not to resolve any factual disputes. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A summary judgment motion will not be defeated merely on the basis of conjecture or surmise. *Bryant v. Maffucci*, 923 F.2d 979, 982 (2nd Cir.1991), *cert. denied*, 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991)

In ruling on a motion for summary judgment, the court is required to draw all factual inferences in favor of, and take all factual assertions in the light most favorable to, the party opposing summary judgment. *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 36 (2d Cir.1994). If the moving party meets its burden, the burden

shifts to the nonmoving party to come forward with affidavits, depositions, or other sworn evidence setting forth specific facts showing there exists a genuine issue of material fact. *Rule v. Brine*, 85 F.3d 1002, 1011 (2d Cir.1996), *accord* FRCP 56(e). The nonmoving party must do more than simply show there is some metaphysical doubt as to the material facts. *Trans Sport, Inc. v. Starter Sportswear*, 964 F.2d 186, 188 (2d Cir.1992) (citations omitted). The evidence favoring the nonmoving party must be more than merely colorable. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. Hence, the nonmoving party may not simply rely on speculation, conclusory allegations and mere denials to raise genuine issues of material fact. *United States v. 15 Black Ledge Drive*, 897 F.2d 97, 102 (2d Cir.1990).

■ The Second Circuit has held that summary judgment is appropriate even when the issue is a contract's proper construction, so long as the words of the contract convey a definite and precise meaning absent any ambiguity. *Lazard Freres v. Protective Life Insurance Company*, 108 F.3d 1531 (2d Cir.1997). It is well settled in New York that the threshold decision on whether a contract is ambiguous is the exclusive province of the court. *In re Sturman*, 222 B.R. 694, 705; *Sutton v. East River Savings Bank*, 55 N.Y.2d 550, 554, 450 N.Y.S.2d 460, 462, 435 N.E.2d 1075, 1077 (1982). The construction and interpretation of insurance contracts are not treated any differently than other business contracts. *Francis v. INA Life Ins. Co. of New York*, 809 F.2d 183, 185 (2d Cir.1987).

### The Business Interruption Claim

■ It is the burden of the insured to prove that the claim it asserts for business interruption losses fits within the policy terms both factually and legally. *C–Su-*

*zanne Beauty Salon, Ltd. v. Gen. Ins. Co. of Am.*, 574 F.2d 106, 114 (2d Cir.1978); *In re Paul Revere Life Ins. Co. v. Bavaro*, 957 F.Supp. 444, 447 (S.D.N.Y.1997). Any claim for losses under a business interruption policy requires an analysis of the several elements that go into making up the claim. First, the losses must arise as a result of a covered peril. Here the covered peril was the destruction of the inventory, furniture, fixtures and equipment at the two stores. There is no dispute that this triggering event did occur.

■ The Policy provides that the amount of the covered loss is based on the net income before the physical loss occurred and the likely net income if no loss had occurred. The Debtors' pre-filing net income was negative. That however is not dispositive. It is also necessary to look at what the Debtors' net income would have been if no loss had occurred. *See Keetch v. Mutual of Enumclaw Ins. Co.*, 66 Wash. App. 208, 831 P.2d 784, 786 (1992); *see also Northwestern States Portland Cement v. Hartford Fire Ins. Co.*, 360 F.2d 531 (8th Cir.1966). The Defendants properly note that the Debtors were running GOB sales due to end on December 24, or just over three months after the date of the loss. The Defendants further urge that having gotten the *retail* price for the destroyed inventory, the Debtors have already received payment in full for any net income they might have earned. That argument is based on the admission that the inventory rollover times were between two and a half and three months. The Defendants position is that it is the Debtors cannot recover twice for what is, in essence, one loss. *J&R Electronics Inc. v. One Beacon Ins. Co.*, 12 Misc.3d 1184, 824 N.Y.S.2d 763 (N.Y.Sup.2005), *aff'd*, 35 A.D.3d 169, 825 N.Y.S.2d 462 (N.Y.App. Div.2006).

■ The Court must also consider another element of the construction of the

business interruption claim—how long was the business going to be to be interrupted? In many cases this would be a factual issue not susceptible to resolution on summary judgment. Here the Court finds the answer lies in the Court order of August 30, 2001. The maximum period of the GOB sale was until December 24, 2001. It follows that since the Debtors were going out of business, there are not demonstrable probable future earnings and there can be no recovery for business interruption losses beyond that time period. *Dictiomatic, Inc. v. United States Fid. & Guar. Co.,* 958 F.Supp. 594 (S.D.Fla.1997) ("in order to recover lost profits, there must be an ongoing business with an established sales record and proven ability to realize profits at the established rate"); *Manduca Datsun, Inc.v. Universal Underwriters Ins. Co.,* 106 Idaho 163, 676 P.2d 1274 (Idaho App.1984) (car dealership which was "basically out of business" suffered fire damage and court refused to allow recovery for loss of earnings because at time of fire dealership's bank financing had terminated, the work force had been reduced and it had ceased operations); *Berkeley Inn, Inc. v. Centennial Ins. Co.,* 282 Pa.Super. 207, 422 A.2d 1078 (1980) (business partially destroyed by fire and court refused to allow recovery for lost earnings because the "business was doomed to failure" and business operations could not have continued as a viable enterprise, notwithstanding the fire); *Wilson v. Monarch Life Ins. Co.,* 971 F.2d 312 (9th Cir.1992) (court held that mere collection of accounts receivable does not constitute the running of a chiropractic business).

As to 1 World Trade Center, which was a total loss, December 24, 2001 is the outside limit of the period of restoration.[7] The only alternative for the 1 World Trade

---

7. The Debtors urge that the Period of Restoration extends, as to the World Trade Center store, to when the World Trade Center is rebuilt. The Court disagrees finds that the unambiguous language of the Policy provides otherwise. The Policy states that the "period of restoration" is the theoretical time to replace the *insured property,* which is the inventory, furnishings, fixtures and equipment, in either the same or an alternate location. The Policy does not cover the leasehold interest in the real property.

There have been a number of cases concerning the scope of business interruption insurance with respect to the destruction of the World Trade Center. A recurring theme of the claims of the retail stores which operated there is that they are entitled to claim coverage until the World Trade Center is rebuilt since the retail opportunities at the World Trade Center allegedly provided a unique selling environment which was especially profitable. Despite somewhat differing policy language in each case, no retail store has ultimately been successful in having the courts find that coverage continues until the World Trade Center is rebuilt. Rather, the so-called "September 11th cases" have effectively limited the period of restoration to the amount of time required for the insured companies to replace their insured property at alternate locations in order to resume their operations.

In *Duane Reade, Inc. v. St. Paul Fire and Marine Ins. Co.,* 411 F.3d 384 (2d Cir.2005), the Second Circuit made clear that an insured did not have the right to business interruption insurance during the indefinite and potentially very lengthy period of time before something was built on the World Trade Center site. In so holding, the Court stated that "[t]he rebuilding of the WTC * * * will be a herculean undertaking far exceeding the rebuilding of a Duane Reade store in an existing building, or even in an as-yet-to-be built Manhattan office building, and involving numerous and complex contingencies over which neither Duane Reade nor [its insurer] has any control. Under these circumstances, it would be entirely unreasonable to interpret the Restoration Period to include the time it would take for Duane Reade to resume operations in a store located at its former site where that site was neither the subject of the insurance policy nor expressly provided for in the calculus set forth in the restoration period." *Id.* at 396. *See also Retail Brand Alliance, Inc. v. Factory Mutual Insurance Co.,* 489 F.Supp.2d 326 (S.D.N.Y.2007) (the period of liability ex-

center store would have been resumption at a new location. While it might have taken more than three months to find an alternative location, it would have been unreasonable for the Debtors to have sought an alternative location since they were already going out of business with a sale scheduled to end on December 24, 2001.

As to 170 Broadway, a similar analysis must be made. If the furniture, fixtures and equipment had to be replaced, and such replacement would have taken more than three months, then replacing them, while potentially compensable under the Policy, an issue not before the Court at this time, would be unreasonable. If the furniture, fixtures and equipment only needed to be cleaned, while it would then

have been theoretically possible that the location could have been re-opened before December 24, 2001, the Court concludes that reopening was neither required nor appropriate in light of the short period of time remaining and the well-known extreme disruption in the immediate area surrounding 170 Broadway during that period.[8]

On the record before the Court, and given that the matter has been presented by summary judgment, the Court is able to determine only that the Debtors' calculation of its business income loss claim is grossly inaccurate and that the Debtors likely have few, if any, recoverable losses.

■ The proper way to for the Debtors to calculate their claim would be to start

---

tended until the insured could build reasonably equivalent stores in a reasonably equivalent location, not for the hypothetical time that it would take to rebuild its stores in a rebuilt World Trade Center); *Streamline Capital LLC v. Hartford Casualty Insurance Co.*, 2003 WL 22004888 (S.D.N.Y.2003) ("it is wholly unreasonable to think that the period of restoration should be tied to the rebuilding of real property over which neither the insured nor the insurer had any control, instead of tying it to a process that the plaintiff controlled; the acquisition of replacement office space and the installation of the plaintiff's personal property in that space."); *Royal Indemnity Co. v. Retail Brand Alliance, Inc.*, 33 A.D.3d 392, 822 N.Y.S.2d 268 (2006) (Brooks Brothers, which had a store in a nearby building to the World Trade Center sought extended business interruption coverage which was denied because "the insurance seeks coverage based on damage to the World Trade Center, *property belonging to a non-party* to this action and the motion court correctly declared this was beyond the scope of the extended business income coverage.")(*emphasis added*).

Although each of the policy forms involved in *Duane Reade, Retail Brand Alliance, Streamline Capital* and *Royal Indemnity* differ, the results are the same. The instant Policy is no more favorable to the Debtors' arguments. The Debtors have no legal right to obtain a lease for any premises at any

building located on the World Trade Center Site.

The Debtors argue that the instant Policy differs from those noted above because by listing its stores in the declaration, it obtained site-specific coverage. This argument is unavailing. Like the policy in *Duane Reade*, the site occupied by Cosmetics Plus in the World Trade Center was neither the subject of the Policy nor expressly provided for in the calculation of the Period of Restoration "as might be expected had the parties intended to single out the WTC store in a policy that covered all of" the Debtors stores. *Duane Reade*, 411 F.3d at 395. Rather, like the policy in *Duane Reade*, the instant Policy is a general one that covered all of the Debtors many retail stores and contemplates the possibility that stores will be rebuilt in new locations.

8. The multi-story building in which the store was located remained and the Debtors store was intact once the broken window was replaced. Plainly, the interior premises, comprised of the furniture, fixtures, equipment and inventory, could be "repaired, rebuilt or replaced." The store premises were not permanently destroyed, as the 1 World Trade Center premises had been. The dispute over whether the store needed to be gutted and then rebuilt or whether it could simply be cleaned and refurbished is not before the Court at this time.

with matters as they stood on August 30, 2001 after the Hilco Agreement was approved. That agreement fixed the amount the Debtors were to receive from all sales, who was responsible for various expenses and the like. In determining the proper amount payable, the Debtors would first look at what they had been projected to receive under the Hilco Agreement from the sales at the two stores. They would then look at the insurance recoveries for the inventory. *See J & R Electronics, supra.* Only if the amount the Debtors actually received was less than the amount the Debtors were projected to receive, could there be a business interruption loss.[9]

The Court also lacks information from either party as to whether there were any fixed costs, such as rent, that the Debtors might be able to recover.

For the foregoing reasons, this Court strikes the entirety of the Debtors' proof of loss that seeks to recover for loss of profits for the period after December 31, 2001. As to the remaining portion of the proof of loss, the Court directs that the Debtors prepare a new proof of loss based on the guidelines set forth herein.

### CONCLUSION

For the reasons set forth above the Court partially grants the Defendants motion for summary judgment on Count II of the Amended Complaint. The Debtors' cross-motion is denied.

Settle Order.

9. As the inventory rollover period was substantially identical to the period of closure, it significantly increases the likelihood that any loss was minimal. In addition, the other Cosmetics Plus stores were available outlets for inventory from the warehouse.